# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **JEFF REYNOLDS,** | ) | |
| | ) | |
| **COMPLAINANT,** | ) | |
| | ) | |
| **V.** | ) | **CIVIL NO. _____** |
| | ) | |
| **JEH JOHNSON, SECRETARY,** | ) | |
| **DEPARTMENT OF HOMELAND** | ) | **JURY TRIAL DEMANDED** |
| **SECURITY,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

_____ )

## COMPLAINT
### (Title VII, ADAAA)

## I.  INTRODUCTION/ PRELIMINARY STATEMENT

Plaintiff Jeff Reynolds hereby files this Complaint, alleging disability discrimination and retaliation, in firing, failing to reassign and firing him. Reynolds alleges below that when he revealed his disabilities and opposed Defendant's prior discrimination at the Office of International Affairs, the Agency's Office of Chief Counsel reneged on its offer to reassign him thereto, even though the Associate Counsel for Litigation, Mr. Fried, thought Reynolds had done a "great" job there previously, and had been "excited" to have Reynolds return. The Agency then refused to so much as interview Reynolds for available positions as they became available. **OCC's Chief, Brad Kieserman, has admitted intent to do this on account of Reynolds' case and the then-Deputy Chief, Mr. Sevier, has also made statements tantamount to admissions that he will not permit Reynolds to be re-hired.** Those admissions alone would be sufficient to compel a trial. But as is now demonstrated, the record- as developed through EEOC proceedings— is also replete with the sort of timing and pretext evidence that would easily warrant the jury's inferring retaliatory and discriminatory intent.

## II.  PARTIES

1.      Reynolds is a former GS-13 Attorney for the Federal Emergency Management Agency, an Agency within the Department of Homeland Security ("Defendant"), who was based in Washington, D.C.

2.      Defendant Jeh Johnson, is the Secretary of the Department and is sued in his official capacity only.

## III. JURISDICTION AND VENUE

3.      The Court has jurisdiction of this matter pursuant to 42 U.S.C. § 2000 et. seq and 28 U.S.C. 1331, 1343(a).

4.      Venue is proper in the District of Columbia, because this case arises out of discrimination and reprisal committed by Defendant with respect to Plaintiff's employment and applications for employment in this District.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.      Reynolds protested his treatment to through EEO counselor contacts.

6.      Reynolds filed formal charges of discrimination with the Department's EEO office on or about March 9, 2010, December 30, 2010, and March 22, 2013.

7.      On October 1, 2015, Reynolds received a final decision on his claim from an Administrative Judge ("AJ") with the Equal Employment Opportunity Commission's San Antonio Office.

8.      On or about December 2, 2015, Mr. Reynolds filed a timely appeal with the Office of Federal Operations.

9.      Because 180 days have passed since Mr. Reynolds filed his appeal and there has been no final decision by the Commission, Mr. Reynolds is free to file his lawsuit on the issues raised in his March 9, 2010 claims.

10.     On or about July 22, 2016, the Agency issued a Final Agency Decision concerning the claims at issue in Mr. Reynolds' December 2010 complaint.

11.     Because it is within 90 days of receipt of the final action, and no appeal has been taken, Mr. Reynolds is free to file his lawsuit on the issues in his December 30, 2010 claims.

12.     Because 180 days have passed since Mr. Reynolds filed his formal complaint and there has been no final decision by the Commission, Mr. Reynolds is free to file his lawsuit on the issues raised in his March 22, 2013 claims.

13.     Therefore, Reynolds is now free to exercise his private right of action in the U.S. District Court and to obtain a trial de novo pursuant to 42 U.S.C. 2000e-16(c).

**V.   FACTS PERTAINING TO THE UNLAWFUL FIRING, AND NON-SELECTION OF MR. REYNOLDS UNDER POSITION SA-09-391-LES3**

**A.   Reynolds Succeeds While Working for OCC; Then Goes to External Affairs**

14.     It is undisputed that Plaintiff Jeff Reynolds ("Reynolds") was a successful lawyer with FEMA's Office of Chief Counsel ("OCC").

15.     Reynolds sought and accepted reassignment to a non-lawyering job at External Affairs in late 2008, to obtain a permanent position. (See Complaint ("Compl.") Ex. 1— Deposition of Adrian Sevier, May 27, 2015, at 15).

16.     Adrian Sevier is currently Chief Counsel, and has been since October 2014.  He Acting Chief Counsel between March 2014 and October 2014, and Deputy Chief Counsel between March 2006 to March 2014.  Mary Ellen Martinet was an Associate Chief Counsel.

17.     Martinet selected Reynolds for duty at Headquarters while he was working in Louisiana, and Sevier approved. Compl. Ex. 2 —-Martinet 2-11-15 Dep. at 22.

18.     For some period after Reynolds left OCC for a position with the Office of External Affairs, OCC badly wanted Reynolds to return to OCC. Compl. Ex. 79.

19.     Thus, Jordan Fried, an Assistant Chief Counsel ("ACC") for litigation -- Reynolds' former supervisor-- wrote to Reynolds in June 2009: "I think you did a great job in your stint with me and was excited to have you back." Compl. Ex. 3.

20.     Reynolds had also previously reported to Martinet, when he worked at OCC.  Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing), p. 4, Agency Alleged Fact No. 5. Compl. Ex. 2 at 14.

21.     Martinet admits that neither Reynolds' performance nor later termination by External Affairs, nor his performance there, were factors in the later non-selection of Gilbert by her in 2010 for a "CORE" position. Compl. Ex. 2 at 75-76.

**B.  It is Undisputed That Reynolds Has Covered Disabilities of Which the Agency is on Notice**

22.     The Defendant admits that Reynolds has disabilities covered by the Americans With Disabilities Act Amendments and the Rehabilitation Act.   Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing, p. 4, Agency Alleged Fact No. 8.

23.     Thus, Reynolds endures clinically diagnosed depression and anxiety, and did at the relevant times of his non-selection and termination by the Defendant.

24.     On June 2, 2009, Dr. Richard Greenberg wrote the Agency, informing it of Reynolds' diagnoses. Compl. Ex. 4.

25.     On June 3, 2009, Greenberg sent the correspondence directly to Jensen. Compl. Ex. 4.

26.      Jensen forwarded Greenberg's correspondence to Cameron on June 3, 2009 Compl. Ex. 4.

27.      Jensen raised the matter of Reynolds' medical conditions with Human Capital, to assist in setting up FMLA for Reynolds.

28.     In fall 2009 when he got back from FMLA, Reynolds told Sevier that he had depression and anxiety. Compl. Ex. 5 Reynolds Dep. at 197.

29.     Reynolds went to Sevier a week before (November 2009) termination with fear of being terminated on account of disabilities and retaliation. Compl. Ex. 5 (Reynolds Dep.) at 187-188, 196, 197.

30.     Furthermore, despite otherwise attempting to cover up, Sevier admits he was in communication with Cameron about Reynolds.

31.     Cameron told Sevier about Reynolds' medical situation.

32.     Fried knew about Reynolds' medical situation, at least as of June 4, 2009 at 1:55 PM, because that's when Reynolds emailed him the information. Compl. Ex. 6.

33.     Cameron was the moving actor behind Reynolds' firing.

34.     Cameron responded to Ex. 9, in which Reynolds referenced Ex. 9, by writing to employee relations for "HELP!!!" —

35.     Cameron has no idea how many probationers have worked for her before Reynolds.

36.     Cameron forgets whether she has ever had more than 5, 10 or 50 subordinates at a time. Compl. Ex. 7 at 167-8.

37.     Cameron is unable to give a range. Compl. Ex. 7 at 168-169.

38.     Cameron also forgets whether there was anything good about Reynolds' performance. Compl. Ex. 7 at 24-25

39.     Cameron also forgets whether she ever discussed Reynolds at all with her deputy Slaten.   Compl. Ex. 7 at 25, 28-29.

40.     Cameron is unable to remember any specifics of untruthfulness f which she by Reynolds. Compl. Ex. 7 at 32-33

41.     Cameron claims that Reynolds failed to improve over time (pp. 36-38).  Compl. Ex. 7 at 36-38, 248-249.

42.     Cameron claims that Reynolds' performance improved in his final 22 days before the termination. Compl. Ex. 7 at 248-249.

43.     Cameron has testified that the single most important thing leading to the firing of Reynolds was his poor performance and lack of detail. Compl. Ex. 7 at 288.

44.     Cameron forgets which products were untimely or involved missed deadlines. Compl. Ex. 7 at 62-63.

45.     Cameron doesn't know whether or not she would have fired him in early October had his probation not been mandatorily extended.  Compl. Ex. 7 at 72.

46.     Cameron also forgets that she called Reynolds "a star" on March 22 (Cameron Ex. 1), a few weeks before he protested against her to Jensen. Compl. Ex. 7 at 82; Comp. Ex. 12.

47.     Cameron forgets when she thinks he ceased to be a "star".  Compl. Ex. 7 at 114.

48.     Cameron (83-84, 154-155) forgets whether Reynolds told her he had anxiety and/or depression, though she admitted that in an email in which she emphasized. Compl. Ex. 7 at 83-84, 154-155.

49.     Cameron forgets if she told Reynolds of his firing right after deciding or if there was a time lag in which she was creating a record to justify what she had already decided to do, though the paper trail discussed in the Statement of Facts renders the answer to that question obvious. Compl. Ex. 7 at 93-94.

50.     Cameron forgets whether Reynolds ever told her he thought she was retaliating for an earlier complaint. Compl. Ex. 7 at 103-104.

51.     She forgets if Reynolds told her she was retaliating against him for his protest to Jensen. Compl. Ex. 7 at 104-105.

52.     She forgets if Reynolds said that that she was discriminating against him. Compl. Ex. 7 at 105.

53.     Cameron (Compl. Ex. 7 at 243-244) forgets whether she used the exact same verbiage to describe Reynolds' successful second quarter performance and allegedly unsuccessful third quarter performance, because she cut and pasted the text from one document to the other. Asked if both of the element 2 write-ups are accurate, she says:

54.     Q.   So do you think it was -- do you feel that your "Completing Tasks," Critical Element 2 write-ups in Quarter 2 and Quarter 3 on Exhibits 31 and 32, are both accurate?

55.     A.   Well, he was only there in Quarter 3 for two of the three months.  So it wasn't a complete review because it was partial.  And I would have to say if I wrote it, and I cut and pasted it, then it is what it is.  Sorry.  I don't know what else to say.

56.     She forgets whether she even considered the third quarter review in the termination process. Compl. Ex. 7 at 246.

57.     Cameron (246-247) doesn't know why she was unable to come up with anything negative to say about Reynolds in the third quarter review, and instead just praised him, before concluding that he was performing less well than expected. Compl. Ex. 7 at 246-247.

58.     Cameron fails to remember whether or not she thought Reynolds was a security risk or what kind of risk he might pose, so she is unable to explain the unprecedented security she arranged for his firing despite his posing no security risk at all. Compl. Ex. 7 at 271-272.

**C.   Cameron and Slaten Praise the "Star" Reynolds, for "Great, Fantastic" Work, Prior to his Protected Protests**

59.     After transferring to the External Affairs Division, Office of International Affairs, Reynolds' first line supervisor was Carol Cameron, and his second-line supervisor was Robert Jensen.

60.      External Affairs had 36 employees as of November 2009. Compl. Ex. 8.

61.     On December 27, 2008, Cameron informed Reynolds by email that "[he was] doing a fantastic job." Compl. Ex. 9 (Reynolds May 13, 2015 Declaration Ex. 1 [JR 2899 3/1/2012]).

62.     On Jan. 26, 2009, Cameron wrote: to Reynolds: "[t]hanks Jeff. Good report." Compl. Ex. 9.

63.      It is undisputed that on January 27, 2009, at 4:06 PM, Cameron wrote: "Jeff: Thanks for taking the lead and pitching in with the Faith-Based work. I really appreciate it." Compl. Ex. 10 (Reynolds 2015 Dec. Ex. 2).

64.     It is undisputed that on January 27, 2009 Cameron wrote to Reynolds, reiterating: "[t]hanks again. You are doing a great job." Compl. Ex. 10 at JR 2962.

65.     On February 2, 2009, Cameron praised Reynolds again by writing: "Good job Jeff. Here are my changes: [] ." Compl. Ex. 10 — Reynolds 2015 Dec. Ex. 3.

66.     On February 4, 2009, Cameron's Deputy Andrew Slaten emailed Reynolds and Cameron: "Great Job Mr. Reynolds[,]" referring to providing information on the Israel Meeting with Mitigation. Compl. Ex. 11.

67.     It is undisputed that on March 22, 2009, Cameron (Ex. F-1—Cameron Dep. Ex. 1) emailed Reynolds, stating in part: "You are a star." Compl. Ex. 12.

68.     Cameron (Ex. F at 114) testified at her deposition that she does not remember when she stopped viewing Reynolds as a star. Compl. Ex. 7 at 114-15.

**D.** **Cameron and Deputy Slaten Make Discriminatory Remarks; Cameron Tries to Deny Reynolds Religious Compensatory Time for Passover; Reynolds Experiences Severe Anxiety and Depression**

69.     Both Cameron and Slaten were prone to making negative, discriminatory remarks against employees in the unit, including Linda Carpenter, who is African-American, Mr. Pillot, who is Latino, and Mr. Reynolds.

70.     For instance, Slaten would comment about how Latino co-worker, Mr. Pillot smelled and talked loudly, and that Pillot must suffer from "Hystasis".[1] Compl. Ex. 13 (Reynolds' ROI Declaration (102-103, 116)).

71.     Slaten said that African-American employee Linda Carpenter speaks in indistinguishable ethnic talk. Compl. Ex. 13.

72.     Cameron tried to set Reynolds' second quarter performance review for April 9, 2009, but Reynolds noted that the date would be Passover.

73.     Cameron repeatedly referred to Reynolds as a "Hebrew" in February/March, and did so again in early April 2009 when she and Reynolds were discussing Passover, at which time she also referred to Passover a "tribal" holiday. Compl. Ex. 13 at 102-103.

74.     Reynolds told Cameron that "Hebrew" is a language, not a people, and noted that it is also not a holiday-- as Cameron had suggested once again in April.  *Id*.

75.      Cameron refused to allow Reynolds to use OPM-sanctioned advanced Religious Compensatory time for Passover, and instead made him use annual leave. Compl. Ex. 13 at 100.

76.     Reynolds began experiencing severe anxiety and depression.

77.     This was exacerbated by Cameron.

78.     Cameron knew about the anxiety.

79.     Cameron wrote, on June 9, 2009, that "Jeff has told most of the Agency about his condition over the last 4 months in endless detail." Compl. Ex. 14.

---

[1]     This seems to have been intended as an insult, such as that the individual spoke too much like a Hispanic.

### E. Reynolds Seeks Reassignment Back to OCC

80.     On April 2, 2009, Reynolds met with Sue Petit of the Agency's Occupational Health. Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) ¶ 6.

81.     On April 4, Petit advised Reynolds to obtain a medical reassignment to OCC or the Faith-Based Office, as a reasonable accommodation of his medical condition. Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) ¶ 7.

82.     Reynolds was seeking such accommodation when, in April and May 2009, Jordan Fried of OCC informed Reynolds that Fried had available FTE's to which Reynolds could be reassigned. Compl. Ex. 13 at 127.

83.     Thus, Reynolds proceeded to deliver his resume to Kim Farley, the Executive Secretary of OCC. Compl. Ex. 5 at 141.

### F. Cameron Provides Reynolds With Favorable Quarterly Reviews; Slaten Continues to Praise Reynolds

84.     On approximately April 7, 2009, Cameron gave Reynolds a favorable performance appraisal for the second fiscal quarter. Compl. Ex. 10 (Reynolds 2015 Dec. Ex. 4).

85.     At that time, Cameron informed Reynolds that he would successfully complete probationary period. Compl. Ex. 23.

86.     The two reviews for October 12, 2008 – April 07, 2009, were both "On Target" and "Positive."

87.     As late as April 17, 2009, Slaten was still praising Reynolds for preparing a "very good AAR[,]" referring to the "After Action Report on Israeli Embassy Visit [,]" copying Cameron who never objected. Compl. Ex. 24.

### G. Reynolds Protests to Cameron's Supervisor, Robert Jensen

88.     On approximately April 13, 2009 (a day during the Passover holiday when work is permitted), as Cameron recounts it, Reynolds "went to Robert Jensen to complain that he was not being treated fairly." Compl. Ex. 5 (Reynolds Dep.) at 103; Compl. Ex. 25.

89.     He specifically used the word "discrimination" and said he was being subjected to harassment-- including increased work load, conflicting instructions and Cameron's poor

management style-- by both Cameron and Slaten, including by religious-based comments made against him by Cameron and Slaten. Reynolds' protest included objection to Cameron's statement that Passover is "tribal". Compl. Ex. 5 at 103-104.

90.     Reynolds also raised disability-related concerns. Compl. Ex. 13 at 91-104.

91.     Reynolds raised his discrimination concerns and those of certain other employees. Compl. Ex. 13 at 91.

92.     Thus, he told Jensen that Linda Carpenter told him she felt discriminated against based on her age. Reynolds also expressed concern that retaliation could ensue, and Jensen told him not to worry, but Jensen was anything but sympathetic. Compl. Ex. 5 at 103.

93.     Jensen cut Reynolds off and asked why Carpenter wasn't complaining personally. Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) ¶ 34.

94.     Jensen indicated that he didn't believe Reynolds. Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) ¶ 35.

95.     Jensen tried to shift the focus to how Reynolds was in a small division and competent division. Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) ¶ 36.

96.     Reynolds told Jensen that he was seeking a transfer away from Cameron and Slaten. Compl. Ex. 5 at 80-81.

97.     Jensen said he would not take Reynolds' slot and move it to another department within his purview. Compl. Ex. 5 at 84.

98.     Ignoring any confidentiality considerations and his own statements not to worry about retaliation, Jensen immediately reported the meeting to Cameron. Compl. Ex. 18.

99.     The next day, employee Jeanine Devlin told Reynolds, that Jensen had commented to Cameron: "we have personnel problems."  Compl. Ex. 10 (Reynolds May 13, 2015 Dec. ¶8).

100.   Between April 21 and 27, 2009, Reynolds (Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) ¶9) met with Sue Petit of Occupational Health, who said it would be good if he could get transfer to OCC or faith-based office.

101.   Fried requested for Reynolds to visit him towards the end of April 2009.

102. Reynolds spoke with Fried briefly about what was going on at External Affairs, and Fried said he needed an answer if Reynolds could return to a trial attorney position.

103. Reynolds (Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) ¶12) accepted the position.

104. In or around late April 2009, Reynolds submitted his resume to Kim Farley (whom Sevier would later tell that Reynolds would not be rehired). Compl. Ex. 26.

105. Thus, paperwork was submitted to Human Capital for Reynolds' transfer back to OCC.

## H. Retaliation Begins After the Jensen Meeting

106. Just after his meeting with Jensen, Reynolds' workload at International Affairs was immediately doubled. Comp. Ex. 34 (Reynolds 2012 Dep.) at 75; Compl. Ex. 10 (Reynolds May 13, 2015 Dec.). ¶ 15.

107. He resisted slightly only in one specific dimension. Thus, Cameron wanted to take duties from Carpenter, who was both older and African-American, and give them to Reynolds. Cameron stated in Carpenter's and Reynolds' presence that Carpenter had stale ideas because she was old. Compl. Ex. 5 at 118.

108. On April 24, Cameron (Ex. J-5-- Goldsmith Dec. Ex. 5) emailed Reynolds that she preferred that he, rather than she, take the lead on a project. She said the reason was that she was: "looking for fresh ideas." Compl. Ex. 21.

109. Reynolds was in touch with OCC's Fried throughout this period.

110. Fried admits that he was aware that Reynolds had EEO grievances against Ms. Cameron, since spring 2009. Compl. Ex. 17 (Fried Dep.) at 37-38.

111. Fried left a message for Charmaine Jiles in the Office of Equal Rights, right in front of Reynolds, when Fried and Reynolds were meeting and Reynolds accepted the offer to return to OCC under his supervision. Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) ¶ 12.

112. That meeting, obviously, came before the Agency reneged on the offer of employment in Fried's litigation unit and blackballed him from any future employment.

113. Reynolds was present at work consistently through May 2009.

114.   However, he was calling Cameron on May 27, to seek leave to go to Wisconsin for a medical appointment. When Cameron was non-responsive, he called Slaten, the Deputy. Slaten said he did not feel comfortable authorizing leave in this scenario and left it to Cameron who could not be reached, as a result, Reynolds did not go to Wisconsin or to the appointment.

115.   Reynolds came into work the following day, May 28, discussed his depression and anxiety symptoms with both Slaten and Cameron, and submitted a leave request for May 29.

116.   Reynolds' (Compl. Ex. 5 at 131; Compl. Ex 22) attendance records reflect presence on May 28 and compensatory time on Friday, May 29.  Between May 10 and 23, he had used no leave.

**I.   Reynolds is Selected by OCC; External Affairs (Cameron), OCC (Trissell) and Employee Relations (Lerner) Confer on Reynolds' Transfer; Reynolds' Transfer is put on Hold When he Fails to Respond to Attempts to Reach him**

117.    The Agency was willing— indeed eager— to return Reynolds to working for the Office of Chief Counsel, as late as May 29, 2009.

118.   However, that offer was revoked on June 4, 2009.

119.   The offer was never extended again.

120.   Sevier and Fried have stated that "too much time had passed."

121.   However, they did not know how much time had passed and the record reveals efforts extending from May 27-29.  Compl. Ex. 19.

122.   The Agency received the report from Reynolds' psychiatrist, Dr. Greenberg, on June 3. Compl. Ex. 4.

123.    In addition, Sevier has stated under oath that he determined from speaking with Cameron that he would not permit Reynolds to be reassigned to work back did in OCC.

124.   Sevier has testified that he did not determine from speaking with Cameron that he would not permit Reynolds to be reassigned back to OCC.

125.   On May 27, 2009, Human Capital started trying to call Reynolds to get his final acceptance of the position in OCC. Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) at Ex. 6

126.   On May 28, Cameron, Chief Counsel David Trissell, Lerner and various others engaged in an extended email discussion of the status of Reynolds' selection by OCC, as Human Capital continued to try to raise him on the phone. (Compl. Ex. 19—Cameron Notes).

127.   On May 29, Sheila Haley of Human Capital emailed Reynolds at 8:05 AM, informing that he was selected for the position in the litigation division. Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) at Ex. 7.

128.   However, at 10:35 AM on May 29, the action was put "on hold," awaiting a response from Reynolds, who was known to be out of range for email or mobile and out of work that day. Compl. Ex. 20.

**J.   Reynolds Invokes his EEO Rights Directly With Cameron on June 1**

129.   On Monday June 1, 2009, Reynolds was still not feeling well but was attempting to get to work.  He was on his way to work on the Metrorail, but he vomited from anxiety about coming into the office after a weekend of worsening depression and anxiety. He turned around at Gallery Place and went home to Tenleytown. Comp. Ex. 23 (Reynolds June 1, 2009 email to Cameron); Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) ¶22.

130.   Cameron does not deny that, when Cameron inquired of his whereabouts, Reynolds emailed her from his BlackBerry, stating that he had tried to come but had to turn back. Compl. Ex. 23 (Reynolds June 1, 2009 email to Cameron).

131.   Cameron does not deny that she responded: "you need to call me right now." Compl. Ex. 7 (Cameron Dep.) at 149; Compl. Ex. 23 (Reynolds June 1, 2009 email to Cameron).

132.   Upon exiting the Metro station, he received an e-mail from Cameron demanding to know his whereabouts (20 minutes later than report time) and threatening him with "AWOL" even though he was still within the time allowed for informing his employer that he would be out. Compl. Ex. 23 (Reynolds June 1, 2009 email to Cameron).

133.   Asked about this, Cameron declines to deny that Reynolds called Cameron back. Compl. Ex. 7 (Cameron Dep.) at 155-156- declining to deny.

134.   In their ensuing conversation, Reynolds he reminded Cameron of his disability — severe depression and anxiety — and informed her he would be taking leave. Compl. Ex. 23 (Reynolds June 1, 2009 email to Cameron).

135.   Reynolds informed Cameron that he believed her behavior towards him was inappropriate and unlawful, and that he was considering filing an EEO complaint (upon his return

from sick leave) against her based on her treatment of him. Compl. Ex. 23 (Reynolds June 1, 2009 email to Cameron).

136.   After being challenged with the **prospect of an EEO complaint,** Cameron inquired as to Reynolds' grounds for filing against her, and Reynolds said that he believed he was being retaliated against for consulting Jensen and being ill.

137.   After Reynolds brought up his prospective EEO complaint, Cameron (Ex. F-9; Compl. Ex. 7 (Cameron Dep.) at 157-158) (declining to deny) told Reynolds that he'd better take that offer from OCC, because otherwise he would not make it through his probationary period.

138.   Cameron swears that she does not remember whether or not she made the statement that Reynolds had better take the offer from OCC. Compl. Ex. 7 (Cameron Dep.) at 157-158.

139.   Reynolds inquired as to what had changed between his last performance appraisal where she stated that he was on track and that he would make it through his probationary period, and June 1 when she was telling him he had better take the offer from elsewhere. Compl. Ex. 7 (Cameron Dep.) at 159 (declining to deny).

140.   Cameron swears that she does not remember whether or not she made the statement Compl. Ex. 7 (Cameron Dep.) at 159.

141.   Cameron answered that what changed was that she found out that he had applied for a different position within FEMA, had complained to her supervisor [Jensen], and that he was "calling in sick too much." Compl. Ex. 7 (Cameron Dep.) at 159.  See also Compl. Ex. 5 (Reynolds Dep. 221-223); Compl. Ex. 13 at 105, 130.

142.   Cameron swears that she does not remember whether or not she made the statement repeated in the immediate preceding paragraph. Compl. Ex. 7 (Cameron Dep.) at 77-78; 104-105 (declining to deny).

143.   Cameron demurs as to any examples of how Reynolds' performance declined since the fully positive second quarter performance review issued in April.  Compl. Ex. 13 at 105.

144.   Reynolds   commemorated the June 1 conversation between Cameron and himself, as described above, in an email to Cameron written a few minutes later. Compl. Ex. 23.

145.   Cameron received the email.

146.   Cameron swears that she does not remember whether or not she made the comments attributed to her in that email. Compl. Ex. 7 (Cameron Dep.) at 157-158 (declines to deny it).

147.   Multiple documents that she created confirm that Cameron knew about Reynolds' anxiety and depression as of June 1, 2009.  Compl. Ex. 7 (Cameron Dep.) at 154-155); Compl. Ex. 19.

148.   However, Cameron (Compl. Ex. 7 at 84, 154-155) has sworn that she cannot remember whether she already knew about Reynolds' anxiety and depression prior to June 1, 2009. Compl. Ex. 7 at 154-155.

149.   Reynolds had a positive leave balance accumulated and available to him as of June 2009.

150.   As of June 2009, Reynolds had not been officially notified of any charge of any AWOL against him. Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) ¶ 26.

151.   In his email commemorating the June 1 conversation, Reynolds (Compl. Ex. 23.) noted that Cameron had previously been put on substantial notice of his "ADA-protected ailments" and had not previously requested formal documentation from him.

152.   Reynolds concluded the email regarding June 1, by stating that "an EEO complaint is likely to follow."

153.   Cameron (Compl. Ex. 7 at 89) testified in 2015 that she does not remember if she knew in the May or June 2009 timeframe, that Reynolds was planning to file an EEO complaint against her.

### K.   Cameron Immediately Tells a Personnel Management Specialist About Reynolds' Condition; Cameron Emails Jensen That Reynolds Must be Fired

154.   Cameron (Compl. Ex. 27) immediately sought "HELP" from Lerner, Chief of Employee Relations, by email, merely an hour after getting the June 1 email from Reynolds. Lerner was already involved in the selection of transfer being arranged by OCC. Compl. Ex. 28.

155.    In her email to Lerner, Cameron betrayed her upset at being "threatened with an EEO complaint." Comp. Ex. 27.

156.   Cameron's (Ex. J-1-- Goldsmith May 11, 2015 Dec. Ex. 1) email exchange with Yvonnzier Staley from June 9, 2009, indicates a verbal discussion about Reynolds.  Compl. Ex. 14.

157.   At 11:38 AM –Cameron emailed Jensen. Her first comment was: "[h]e said that he was

ill. . ." Compl. Ex. 29.

158.   Cameron's correspondence states the following:

I encouraged him to call Human Capital about the position in OCC. He said that he was too nervous to take that job and that the job is too stressful. I told him that it was likely he would not make it through probation in International Affairs. He said he was going to go on "long-term medical leave" and that he would file an EEO complaint against me (for what I do not know). **He said that his work was excellent and asked why I was not "overly critical as usual" in the last few weeks. I told him that I knew of the OCC job offer and that I believed as he had initiated the action, he would take the job.**

I told him that as he is on "sick leave" today, he should contact Candice tomorrow or Wednesday if he is still ill, and Linda Carpenter on Thursday and Friday if he will be out. **He needs to be terminated from his probationary position.**

Emphasis added. Compl. Ex. 29.

159.   Sometime after Reynolds returned to External Affairs from FMLA in September 2009,

Cameron recounted again how he told her he intended to file an EEO complaint. Compl. Ex. 19.

160.   Cameron's actions and statements are probative of, indeed central to, Reynolds'

claims of disability discrimination and retaliation, because such misleading and false statements

and actions provide "factual content that allows the [fact-finder] to draw the reasonable inference

that the defendant is liable for the misconduct alleged[,]" and "sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009),

quoting *Twombly v. Bell Atlantic*, 550 U.S. 544, 570 (2007).

## L.   Cameron Immediately Starts Attempting to Build a Record Against Reynolds on June 1, 2009

161.   After the interaction with Reynolds but on that very same day, notwithstanding

having made much of the fact that she was flying to Brussels, Cameron found time to document

"poor performance" by Reynolds.  Compl. Ex. 30.

162.   It was the very first time ever that she had done so.

163.   Cameron drafted correspondence with Reynolds that was not sent to him, referencing

Reynolds' "accusing her of harassment" and concluding by threatening "formal action, up to and

including your removal from Federal Service[,]" and included her "question[ing] of his stability in the workplace" as examples of the "poor performance."

164.   Cameron's draft correspondence also noted that she knew Reynolds was now being offered the position with OCC, and that she was withholding her knowledge of that from Reynolds to see whether she could build a record that he failed to raise it with her first.

165.   Cameron's document also admitted upset at his being "very unstable" and "on lots of medication etc." She concluded that she is "working on the probationary letter."

166.   The Agency did not provide the document to Reynolds until litigation.

167.   Despite Cameron's allegation that he had been sick too often, in the three weeks immediately before June 1, 2009, Reynolds had not been on sick leave at all and he had a sick leave balance of 115 hours. Compl. Ex. 22.

**M.** **FEMA Receives Medical Documentation From Dr. Greenberg; Reynolds Protests Cameron's Threats, to Jensen, on June 4**

168.   On June 2, 2009, Dr. Richard Greenberg wrote the Agency informing it of his diagnoses.

169.   The letter states, in relevant part, that Reynolds was experiencing hopelessness and fear, very pronounced bouts of anxiety and depression, an acute relapse of chronic major depressive disorder, and severe generalized anxiety disorder with an overlap of severe insomnia.

170.   Greenberg also concluded that Reynolds suffered from adult attention deficit disorder and from OCD. Accordingly, he recommended two to six weeks of medical leave. Compl. Ex. 10 (Reynolds 2015. Dec).

**N.** **OCC Rescinds Reynolds' job Offer on June 4, 2009**

171.   On June 4, 2009, at 9:24 AM, External Affairs Chief Jensen continued his correspondence about an extended medical leave, with Reynolds. Compl. Ex 66.

172.   Then, at 10:24 AM, Fried wrote to Montoya: "Jeff, we have been trying to contact you for some time about the possible offer to work for OCC that has been working its way through HR, but you have not responded to our calls or emails. We have an overwhelming workload and need

to get staffed as quickly as possible. I want to let you know that we will be looking in a different direction and you will not be getting a call with an offer." Compl. Ex. 31.

173.   An hour later, the email was forwarded to Sevier and Kim Farley as well. *Id.* At 11:35 AM on June 4, Sevier wrote to Fried and Montoya: "Kim: Litigation will not be hiring Jeff Reynolds. Please take care of any administrative issues with pulling this back from Human Capital. Thanks." Compl. Ex. 32.

174.   Fried and Montoya then received a June 4, 2009 letter from Reynolds referencing his depression and indicating that he was not well enough to take the job at that moment. It was sent at 1:55 PM. Compl. Ex. 33.

175.   At 2:58 PM, Fried wrote to Reynolds that he had done a great job and had been excited to have him back, but could no longer wait. Compl. Ex. 3.

**O.   Reynolds Goes on Leave; Reynolds Informs Fried That he can now Return to OCC, Applies for the Position he had Already Been Awarded and Makes the Cert List Prior to Being Terminated From External Affairs, but Fried Says OCC is "Moving in Another Direction"**

176.   When he went on extended leave at this time, Cameron told Reynolds he was going to fail his probationary period during the June telephone conversation. Compl. Ex. 23.

177.   Cameron testified in 2015, that she does not remember whether she told Reynolds in June 2009, that he would fail his probationary period.

178.   Reynolds emailed Fried informing him that he was getting better and thought he would be able to come on board at OCC.

179.   Fried previously testified that he forgets that if he got contact from Reynolds after the fact that he was still interested, but insists that he would not have held it against Reynolds that it took a while for him to get back in touch. Compl. Ex. 17 (Fried Dep.) at 55-58.

180.   On or about July 29, 2009, Reynolds applied for the job he had just missed out on at OCC with Fried- there were two openings posted, Trial Attorney, Job Announcement No. SA-09-391-LES3.  Compl. Ex. 13 (Reynolds ROI Dec.) at 127 and Reynolds applied for both. Reynolds also wrote to Mr. Broyles about a position, but got no response.

181.   The positions were still not filled when Reynolds returned from FMLA in September 2009.

182.   In fact, Melissa Pleasant confirmed to Reynolds that his name was on the certification list. Compl. Ex. 16 (Pleasant affidavit) 487) (recalling that she heard Reynolds' name was on the list, but unable to recall if she told him so).

183.   Reynolds (Compl. Ex. 13 at 15 ¶¶11, 27) returned to work full time at External Affairs at the beginning of September. By then, he had already applied for the position with Fried, which, while being competed, was still open.

184.   Reynolds (Compl. Ex. 13 at 9-10 ¶¶11, 18) had told Fried of his applications by both phone and email.

185.   Fried, who previously thought (Compl. Ex. 13 at 127 ¶10; Ex. A-7) that Reynolds "did a great job" and was "excited to have [him] back," was now saying, however, that he was "moving in another direction" even though the positions were still open.  Compl. Ex. 5 at 154-155.

**P.   Reynolds Protests Discrimination and Seeks Reassignment From Dave Garratt, and States Intent to File Congressional Complaint, but the Agency Just Stalls Before Firing Reynolds**

186.   On or about November 3, 2009, Reynolds met with the highest ranking civil servant, Dave Garratt to outline his EEO claims and seek his assistance, requesting **reassignment** away supervision by Cameron and Slaten. Compl. Ex. 13 at ¶13.

187.   In other words, he was seeking that Garratt arrange for the completion of the reassignment process that was begun in April and May 2009. Garratt failed to ever do so. On November 4, ignoring the fact that the Agency had already awarded Reynolds a position that still remained vacant at that very time, LER's Lerner emailed Reynolds (Compl. Ex. 37) to officiously inform him that: "[r]equests for reasonable accommodation should be addressed to the Office of Equal Rights If that office determines an accommodation across organizational lines is warranted it will work with our office to identify potential vacant positions."

188.   That same day, Reynolds emailed Jensen and Cameron, in part informing them of his intent to file a Congressional complaint regarding "abuse of authority" and "violation of law." Compl. Ex. 36.

**Q.  Cameron Tells Reynolds to Choose Between "Doing a Good job" and his EEO Case**

189.   When Reynolds informed Cameron that he was speaking with the Equal Rights Office and suggested they try to repair the relationship using the services of Ms. Cindy Mazur of the Alternative Dispute Resolution staff, Cameron rejected him. Instead, she communicated that she perceived a dichotomy: either Reynolds would be concentrating on his EEO complaint or alternatively, would just work hard and do a good job. Compl. Ex. 13 at 102; Compl. Ex. 35 (Response to Interrogatory No. 4.

190.   At this point Reynolds once again felt threatened and intimidated from pursuing his rights. *Id.*

**R.  Cameron and Sevier Confer About Reynolds, Though Sevier Attempts to Cover This Up**

191.   Sevier admits that he had conversations with Cameron about Reynolds, and that they occurred prior to termination. Compl. Ex. 1 (Sevier Dep.) at 18.

**S.  Reynolds Meets With Sevier and Broyles, but Chief Counsel Sevier Coordinates With Cameron and Blackballs Reynolds, Possibly Through Today**

192.   In fall 2009, Reynolds met with DCC Sevier, and discussed Reynolds' FMLA and "depression and anxiety." Compl. Ex. 5 at 187. Reynolds went to Sevier again in November--a week before the termination-- fearing imminent termination and seeking to move to OCC, but Sevier doubled down on discrimination. Compl. Ex. 5 at 187-188, 196, 197.

193.   Sevier (Ex. L—May 27, 2015 2015 Dep. at 10, 12-14, 24; Compl. Ex. 10 (Reynolds May 13, 2015 Dec). Ex. 11) *admits* that at least twice within a few months after June 1, 2009, but definitely before the November firing, he instructed Associate General Counsel Mary Ellen Martinet and administrator Kim Farley, and possibly Ed Broyles, Leigh Hoburg and/or others, too, that he would not approve any selection of Reynolds. Notably, this was well before Cameron documented any performance deficiencies on Reynolds' part, and long before he accused Reynolds of insufficient "maturity".

194.   However, between those two particular occasions of admitting this, in his (Compl. Ex. 1 at 41) January 23, 2015 deposition, Sevier *denied* recommending against hiring Reynolds to Martinet.

195.   Martinet claims that she forgets what Sevier said when she raised with him the possibility of hiring Reynolds. Compl. Ex. 2 (Martinet 2-11-2015 Dep.) at 24-25.

196.   Sevier (Compl. Ex. 1 -- May 27, 2015 Dep. at 24) admits that he never told Martinet or Farley that his opposition to hiring Reynolds was rescinded. Indeed, Sevier, now the Chief Counsel, admits (Compl. Ex. 1 at 25) that he may still be unwilling to rehire Reynolds, but somehow is not sure.

197.   Despite his earlier successful stint in OCC and Reynolds' many applications, Sevier (Compl. Ex. 1 at 25) claims on one hand that since June 2009, no hiring manager has ever mentioned Reynolds to him.

198.   However, Sevier could not deny (Compl. Ex. 1 at 30-31) on the other hand that Liebross might have told him that *Kieserman* said he would not hire Reynolds. Sevier (Compl. Ex. 1 at 33-34) admits that his determination to not hire Reynolds was not a secret, and that it would have been acceptable for Martinet to tell other managers.

199.   During the week of November 16, 2009, Reynolds (Compl. Ex. 13 at 98) met briefly with Sevier.  They discussed the possibility of a return to OCC. Sevier acknowledged that there were still the two open positions that Reynolds had applied for in the summer under Announcement SA-09-391-LES3, for which Fried was the recommending official, and Sevier was the selecting official. Instead of coming clean with Reynolds and admitting that of which he now boasts-- that her had already told at least Martinet and Farley that he would not take Reynolds back, Sevier recommended (Ex. 13 at 98) that Reynolds speak with Fried.

200.   Sevier (Compl. Ex. 13 at 98) also recommended that Reynolds speak with Broyles, head of General Law, about positions in his sub-department since one employee vacated his slot for a position in the Office of Field Counsel.

201.   Reynolds (Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) ¶ 27) then communicated with Broyles, expressing interest in working with him, and reminding him that he previously expressed interest in hiring Reynolds. Reynolds (Compl. Ex. 10 (Reynolds May 13, 2015 Dec.)  ¶¶27-28) never heard back from Broyles.

202.   Also before the firing from External Affairs, Fried told Reynolds that he was no longer in a position to hire Reynolds, though, Fried was unable to articulate any reason. Compl. Ex. 5 (Reynolds Dep.) at 179-180.

**T.   Reynolds is Terminated in the Hallway in the Presence of Security Officers, After he Inquires Again About his "Formal Request for a Transfer"**

203.   On November 23, 2009, Reynolds (Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) -12 (Reynolds May 2015 Dec. Ex. 12)) wrote to Pauline Campbell of ERO, with a copy to Garratt, "to determine the status of his formal request for a transfer." Reynolds offered to seek out additional physicians' information if necessary, and added that "since seeking formal ERO counseling the hostile environment has intensified."

204.   On November 24, 2009, Jensen and Cameron went out of their way to humiliate Reynolds, not just by firing him, but in the manner in which they accomplished the deed-- in the hallway in the presence of security.

205.   Because she handles the Agency's unemployment claims, witness Jacqueline Nantier-Hopewell has seen a couple of hundred terminations.

206.   She had never before seen one handled in an unprofessional way such as that, regardless of whether they involved misconduct, or even allegations that an employee used physical violence against another. Compl. Ex. 38 (Nantier-Hopewell Dep.) at 70-74.

207.   Both Jensen and Cameron were in the lobby that day.  Compl. Ex. 38 at 50-53, 82-83.

**U.   Fried Denies Reynolds the Position Under SA-09-391-LES3**

208.   On November 24, 2009, after he was told he was fired, Reynolds went to FEMA's other building and asked Fried about the position reflected in Announcement No. SA-09-391-LES3, the duties of which Reynolds had performed successfully previously and which Sevier had (misleadingly) told him to ask Fried about.

209.   When Fried said that he was no longer in a position to hire Reynolds, Reynolds inquired a bit more, and Fried said it was no longer possible.

210.   Critically, though, **Fried remained unable to articulate any reason**. Compl. Ex. 5 at 179-180.

211.   Fried instead said that he would try to arrange for Reynolds to have a DAE position with the Field Counsel under Mary Ellen Martinet. Compl. Ex. 5 at 180.

212.   He suggested that after all, if former employee Pat Hogan could get hired back, then Reynolds should be able to too. Compl. Ex. 5 at 180.

213.   However, Sevier (Compl. Ex. 10 (Reynolds May 13, 2015 Dec.) -11-- Reynolds 2015 Dec. Ex. 11) admits that he had instructed Martinet not to hire Reynolds **before** Reynolds was fired from External Affairs, so of course that was of no use.

214.   Fried (Compl. Ex. 39 (Fried Dep) at 55-57, 79-80) claims to have forgotten the contact from Reynolds that he was still interested in working at OCC, but insists (Compl. Ex. 39 at 55-58) as does Sevier, that had Reynolds ever applied, it would not have been a negative that in June it had taken a while for him to get back in touch.

215.   In the meantime, the position was still vacant as of November 24, 2009, as no selections had yet been made from the July announcement. On November 25, Reynolds emailed Mary Ellen Martinet, hoping to land a position with her. He wrote in part:

> Hope all is well in OC (second only to OC Wisconsin). I wanted to let you know I was terminated yesterday. I won't involve you with the unethical way it occurred or the details, but it happened. Thus, any advocacy you may be able to do within OCC for a PFT/CORE/DAE position would be greatly appreciated and welcomed.
>
> Today, the day before Thanksgiving, I filed for UI in DC. Great fun. I am doing okay though, part of me feels violated and victimized, and another part of me thinks, thank g-d, due to the horrible daily environment I was in.

Compl. Ex. 40.

216.   Martinet admits that she ignored the email. Compl. Ex. 41 (Martinet Dec.) at 78-79.

217.   Martinet admits she may have spoken to Nantier about Reynolds feeling victimized and discriminated against. Compl. Ex. 41 at 79, 90.

218.   She denies Reynolds told her he felt victimized. Compl. Ex. 42 at 58-59.

219.   Martinet says she never considered Reynolds disqualified from working for her for any reason; he was eligible for rehire. Compl. Ex. 41 (Martinet Dec.) at 87.

220.   However, it is undisputed that although he applied for numerous jobs, he never got an interview.

## VI. DEFENDANT HAS MADE NUMEROUS ADMISSIONS, AND PROVIDED FALSE AND PRETEXTUAL TESTIMONY REGARDING FIRING REYNOLDS FROM EXTERNAL AFFAIRS

### A. Cameron Failed to Articulate a Performance-Based Reason for Firing Reynolds When she First Stated Intent to Fire him

221.   In their June 1, 2009 telephone conversation, Cameron informed Reynolds for the first time that he would not successfully complete his probationary period.

222.   Reynolds immediately challenged her for examples or for an explanation as to why or how his performance had declined.

223.   Cameron, however, did not articulate any examples of how Reynolds' performance declined since the positive second quarter performance review of a few weeks earlier.

224.   Cameron still offered no specifics when she (Compl. Ex. 29) emailed Jensen minutes later.

### B. Cameron Offers Admissions, Including That she Conclusively Decided to get rid of Reynolds on June 1, 2009, Before Articulating any "Performance" Excuse

225.   Cameron told Jensen on June 1, 2009 that: "**[Reynolds] needs to be terminated from his probationary position**[,]" referencing his EEO complaint, intent to take medical leave and medical condition, but not a single performance deficiency. Comp. Ex. 29.

226.   Cameron told Jensen therein that Reynolds had challenged her on the performance issue, without mentioning any performance deficiencies.

### C. Cameron Offers False, Belated, and Undocumented References to Alleged Performance Reasons, to Justify Firing Reynolds

227.   Cameron was asked at deposition to explain why she terminated Reynolds' employment.

228.   Cameron's answer basically raises three issues: (1) quality of writing, (2) independence and (3) timeliness of delivery. Compl. Ex. 7 (Cameron Dep.) at 62.

229.   Regarding the quality of writing, Cameron says this was the "primary reason," then points to asking him to craft a plan to enhance the visitors' program, and says he returned a poorly written product. Compl. Ex. 7 (Cameron Dep.) at 52, 62.

230.   Cameron forgets if she ever told Reynolds that he was showing poor writing quality. Compl. Ex. 7 (Cameron Dep.) at 54. On work independence, Cameron is unable to recall if she told Reynolds that he was not sufficiently researching on his own, but claims to have learned from Reynolds' co-workers that he was disturbing them by asking for their assistance with research instead of using the materials repository.  Compl. Ex. 7 (Cameron Dep.) at 48, 53-54.

231.   Cameron's only example of failing to do research on his own is asking co-workers instead of using the repository. She does not remember any other examples. Compl. Ex. 7 (Cameron Dep.) at 53.

232.   Cameron forgets which co-workers complained about Reynolds, when they complained, whether her deputy Slaten was one of the co-workers in question, and (49) whether she ever told Reynolds this, verbally or in writing. Compl. Ex. 7 (Cameron Dep.) at 49, 50.

233.   Cameron also does not remember if Reynolds didn't use it at all, or just didn't always use it when he should have. Compl. Ex. 7 (Cameron Dep.) at 49, 50.

234.   On timeliness, Cameron forgets if she can point to anything that shows that Reynolds didn't produce his work timely, and forgets if there is anything that could refresh recollection. She is unable to recall which products were untimely or involved missed deadlines.  Cameron also forgets if she ever told Reynolds that he was showing poor timeliness. Compl. Ex. 7 (Cameron Dep.) at 41, 52, 54, 62-63.

235.   Cameron's described actions and statements are probative of, indeed central to, Reynolds' claims of disability discrimination and retaliation, because such misleading and false statements and actions are critical to a showing of pretext.

**D.   <u>Cameron's Self-Contradictory Draft Performance Improvement Plan Documents Reveal her Desperate Efforts to Fabricate Excuses to Fire Reynolds</u>**

236.   Cameron prepared a Performance Improvement Plan, that proposed that Reynolds could be fired within 60 days if he failed both to increase and decrease his coordination with his co-workers.

237.   However, she never provided it to Reynolds, and admits it never became effective.

238.   Cameron has accused Reynolds of a performance deficiency of too much reliance on co-workers.

239.   However, as the draft Performance Improvement Plan (Compl. Ex. 43) reveals she simultaneously considered firing Reynolds both for too much reliance on his co-workers, and for too little.

240.   Cameron's described actions and statements are probative of, indeed central to, Reynolds' claims of disability discrimination and retaliation, because they reflect more than a mere "threadbare recital[] of the elements of a cause of action." *Ashcroft v Iqbal*, 556 U.S. 662 (2009). Indeed, such misleading and false statements and actions are critical to making the requisite showings of causality, pretext and intent.

**E.   Cameron Offers an Altered "Annual Review," Created Just for Litigation and Supporting the Firing, to Obfuscate her Earlier Satisfactory Evaluations of Reynolds, and to Falsely Show That Reynolds Violated Leave Request Policy**

241.   Cameron gave Reynolds successful 1st and 2nd quarter appraisals before his protected protests.

242.   Cameron never thought or asserted that Reynolds had performance problems, until after she learned that Reynolds was depressed and anxious, was advocating for religious compensatory time for Passover, and was protesting Cameron's discriminatory behavior to Jensen.

243.   Asked at deposition about the successful appraisals she gave Reynolds before he protested against her, Cameron claims to forget whether or not Reynolds' performance in the first two quarters actually was successful as she wrote. Compl. Ex. 7 (Cameron Dep.) at 55, 60.

244.   Cameron (57) explains Reynolds' favorable performance appraisals by stating that she "tries to be encouraging." Compl. Ex. 7 (Cameron Dep.) at 57.

245.   Asked if it is important to be truthful, Cameron states (57-58) that it is always important to be truthful, "to the best of her knowledge."  Compl. Ex. 7 (Cameron Dep.) at 57-58.

246.   Cameron (82) forgets telling him Reynolds he was a "star" by email on March 22, 2009. Compl. Ex. 7 (Cameron Dep.) at 82.

247.   Cameron forgets telling him he was doing a "great job" (actual time: Jan. 27, 2009). Compl. Ex. 7 (Cameron Dep.) at 83.

248.   Cameron (Ex. 7 at 79) forgets, but does not deny, telling Reynolds he **was** going to make it past probation, after the first two quarters, but before the Passover dispute, the meeting with Jensen and his revelations of his medical state. Compl. Ex. 7 (Cameron Dep.) at 79.

**F.   Cameron Relies on the Exact Same Narrative Statement for the Failing Third Quarter Review as for the Successful Second Quarter Review**

249.   Cameron Ex. 31 is the Second Quarter Review for Mr. Reynolds, which Cameron gave Reynolds just before the Jensen meeting. Compl. Ex. 44.  Ex. 32 is the Third Quarter Review, which she gave him in September, after the pattern of antagonism and retaliation had been established for months. Compl. Ex. 45.

250.   Cameron (242-243) admits that she used virtually the same narrative to explain why Reynolds' results in "completing tasks" in the 2nd quarter was "on track," and the "off track" in the 3rd quarter. Compl. Ex. 7 (Cameron Dep.) at 242-243.

251.   Thus, Cameron (243-244) doesn't know if she cut and pasted the material, or whether that such would explain the similarity. Compl. Ex. 7 (Cameron Dep.) at 243-244.

252.   Nor does she (246-247) have any answer for why she was unable to come up with anything negative to say about Reynolds in the third quarter review, and instead just used words of praise him, before saying he was performing less well than expected. Compl. Ex. 7 (Cameron Dep.) at 246-247.

253.   Cameron (247-248) admits that she again used the exact same language for quality of work in the third quarter review under the third critical element, as she did in the second quarter. Compl. Ex. 7 (Cameron Dep.) at 247-248.

254.   Asked if that was fair to Mr. Reynolds, Cameron said she was confused, but—true to form-- did not express any regret.  Asked who confused her, she (247-248) said "I don't know what more to say without going back and checking my records." Compl. Ex. 7 (Cameron Dep.) at 247-248.

255.   Asked next: what instances of poor work in completing tasks happened during the third quarter that she left out of Exhibit 32 she said "it would only have been for two things. I don't recall."  Compl. Ex. 7 (Cameron Dep.) at 248.

256.   On or about September 9, and/or 10, 2009, Reynolds (Compl. Ex. 35 –Interrogatory Responses-- at 5) informed Cameron that he was evaluating whether or not to seek an accommodation for his disabilities and that he was going to be seeking the advice of EAP, and the Equal Rights Office. On September 10, Reynolds emailed Ed Broyles about an OCC position.

257.   On or about September 9, 2009, Reynolds (Compl. Ex. 35 –Interrogatory Responses-- at 5) indeed contacted the Office of Chief Counsel and the Office of Equal Rights concerning harassment, when Ms. Cameron again falsely accused him of being absent without leave.

258.   Pursuant to instructions given by the EEO counselor, he informed Ms. Cameron on occasions in September, October and November 2009 that he would be meeting with the EEO counselor, effectively notifying her that he was pursuing an EEO claim. Compl. Ex. 35 – Interrogatory Responses--at 6.

### G. Cameron Alters the Second Quarter Review to Falsely Contend That Reynolds Violated her Leave Requesting Requirements

259.   Cameron generated a second quarter appraisal (Compl. Ex. 44) of Reynolds, which makes no mention of any leave requesting issue.

260.   Later, however, she wrote a final annual review alleging that there was such an issue and that she had given Reynolds "feedback" about it.

261.   Thus, after giving Reynolds the original review (Compl. Ex. 46) and firing him on account of his alleged failures, Cameron created (Compl. Ex. 47 at 1-4) and gave the EEO investigator a new, different annual appraisal just for this litigation.

262.   In the new annual review, she claimed as follows:

I gave you an "On-Target" for the 1st and 2nd quarter rating cycle that ended on February 28, 2009. However, the feedback that I gave you relating to those ratings also identified a number of areas in which you needed to demonstrate improvement. The areas that were identified as needing improvement, included. . . **Follow the rules for requesting leave.**

Emphasis added.

263.   Cameron also retroactively changed Reynolds' **second quarter** review, by adding a copy of the Agency's leave policy to the back of the review when she submitted it to the EEO investigator. (Contrast Review in Compl. Ex. 47 with one-page review in Compl.  Ex 44.)

28

264.   The investigator then included it as part of Exhibit F17, "Complainant's Annual and Quarterly Performance Reviews. (Source: Agency)." Compl. Ex. 47.

265.   Even this altered second quarter review, however, fails to actually state anything to the effect that Reynolds was ever told during that quarter that—contrary to official agency policy-- he had to use the phone instead of email for reporting leave, or that he was violating leave reporting policy by not doing so.

266.   In no way did Cameron tell Reynolds at the time of the second quarter appraisal that he needed improvement in following any leave requesting rules.  Compl. Ex. 10 (Reynolds 2015 Declaration) ¶29.).

267.   In Cameron Ex. 9 (Compl. Ex. 27 at 2), Reynolds states: "I asked you to explain why I was risking not passing the probationary period in particular, inquired what changed between my last performance appraisal where you stated I was OT and that I would make it through my probationary period. In reply you stated that what changed was you found out that I had applied for a different position within FEMA and that I failed repeatedly to call in sick. This is not true."

268.   Cameron implies she sent an email on a prior occasion saying to call in rather than email for absence, prior to Cameron Ex. 16, but is unable to identify one. Compl. Ex. 7 (Cameron Dep.) at 188; Compl. Ex. 48.

269.   Cameron (Compl. Ex. 7 at 189) insists that this was not new information-- that employees must call rather than email-- and (190) that she or Slaten would have informed Reynolds of it in a staff meeting. Compl. Ex. 7 (Cameron Dep.) at 189-190.

270.   However, she (Compl. Ex. 7 at 189) admits that she doesn't know if Reynolds was informed of the policy prior to September 18, 2009 when Cameron Ex. 16 was sent, and that she is merely (190-191) speculating that he might know.  Compl. Ex. 7 (Cameron Dep.) at 189-191.

271.   In fact, Agency policy only required Reynolds to contact her within 60 minutes after the start of his shift, and he had done just that by email, and he contacted her within 20-30 minutes of his scheduled start time.  Compl. Ex. 27.

272.   Cameron's described actions and statements are probative of, indeed central to, Reynolds' claims of disability discrimination and retaliation, because, as to causality, pretext and

motive, such misleading and false statements and actions provide "factual content that allows the [fact-finder] to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" and "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. at 678, quoting *Twombly v. Bell Atlantic*, 550 U.S. at 570.

## H. Cameron's False Testimony Regarding Alleged Performance Deficiencies Also Shows Pretext

273.    Cameron, claims (Compl. Ex. 7 at 62) that Reynolds' poor performance on written product was a primary firing reason. Compl. Ex. 7 (Cameron Dep.) at 62.

274.    The Agency asserts that [t]hroughout Complainant's employment in OEA, his performance was below an acceptable standard."

275.    To the contrary, Cameron told Reynolds he *was* going to make it past probation, after the first two quarters.

276.    Asked, Cameron specifically declines to deny telling Reynolds this.  Compl. Ex. 7 (Cameron Dep.) at 79.

277.    Nor does Cameron (Ex. 7 at 82) deny having told Reynolds he was doing a "great job," and (Compl. Ex. 7 at 83) emailing him with the praise: "you are a star." Compl. Ex. 7 (Cameron Dep.) at 82.

278.    Cameron Ex. 7 at (82) also admits even now that Reynolds did good job at faith-based office. Compl. Ex. 7 (Cameron Dep.) at 82.

279.    The Agency has argued that "[s]ome of the problems related to his work included poor time management and project management; turning in numerous assignments late or failing to complete assignments; lack of attention to detail; lack of initiative; and poor general quality of submitted written work[,]" citing Compl. Ex. 69 (Cameron Affidavit) at 138-39; Compl. Ex. 54 (Jensen Aff.) at 168; Compl. Ex. 47; Compl. Ex. 80; Compl. FY 2009 Quarterly & Annual Performance Evaluations (Compl. Ex. 44-46).

280.    In fact, Reynolds was not just a strong performer at OCC such that Fried wanted him back: he was also strong at External Affairs, OIA, leading to the two strong quarterly reviews prior to his key protected activity.

281.   Thus, on May 5, 2009, Cameron (211-212) truthfully praised Reynolds on the April 22, 2009, "After Action Report on Israeli Embassy Visit[,]" saying in writing: "you have a good vision. . . good job."  Compl. Ex. 49.

282.   Though Reynolds sent it to her (Compl. Ex. 50; Compl. Ex. 10 (Reynolds 2015 Declaration), Cameron (Ex. 7 at 225-227) testifies under oath she forgets whether she ever saw the Report.

283.   Though Cameron never mentioned the report at the time, in her 3rd quarter review of Reynolds, a half year later and after his protected activities had begun, she cited to this same work in the Annual Review (Compl. Ex. 46)-- She then claimed: "I returned the report to you with numerous corrections and asked that it be revised."

284.   However, there are no such corrections to be found on the document. Comp. Ex. 10 (Reynolds Dec.) ¶33.

## I.   Cameron Offers Shifting Statements on Whether "too Much Leave" Motivated the Firing

285.   Cameron told Reynolds on June 1, 2009 that he would not make it past his probationary period, and stated that one of the reasons was taking too much leave.

286.   In testimony, however, she (Ex. 7 at 72) says that taking leave was not a factor in failing to make it through probation.  Compl. Ex. 7 (Cameron Dep.) at 72.

287.   Such actions and statements are probative of causality, pretext and motive, as such misleading and false statements and actions provide "factual content that allows the [fact-finder] to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" and "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. at 678, quoting *Twombly v. Bell Atlantic*, 550 U.S. at 570.

## J.   Cameron's Shows Consciousness of Guilt, With Frivolous Assertions That she may not Have Received the June 1 Phone Call or Email from Reynolds

288.   As discussed above, Reynolds' June 1 email (Compl. Ex. 27 at 2) recounts how Reynolds and Cameron spoke on the morning of June 1, 2009, and the contents of the conversation, in which—critically-- Cameron threatened Reynolds with termination, at least in part for protesting Cameron's conduct to Jensen and also for needing medical leave.

289.   Cameron--, as shown-- immediately forwarded that email to Jensen and (Compl. Ex. 27 at 1) Employee Relations' Lerner.

290.   Cameron's deposition approach to Reynolds' June 1, 2009 correspondence (Compl. Ex. 27) was to argue with counsel that while she admitted that she had no **basis** for arguing that she did not receive it and could not deny receiving it, she might not have received the email.

291.   Cameron admits that she never confronted Reynolds that the email was false in any way.

292.   Cameron admits that there was a phone call between Reynolds and herself on the morning of June 1, 2009. Compl. Ex. 7 (Cameron Dep.) at 153-154.

**K.   Cameron Self-Servingly and Falsely Denies Seeing Reynolds' June 1, 2009 Email to her, Referencing his Medical Situation**

293.   Cameron **does not deny** that by June 1, 2009, she had known for several months that Reynolds had anxiety and depression. Compl. Ex. 7 (Cameron Dep.) at 154-155.

294.   Cameron denies that she saw Reynolds' June 1 email (Compl. Ex. 27) to her. Compl. Ex. 7 (Cameron Dep.) at 85, 155.

**L.   Cameron Falsely Denies Coordinating With OCC's Sevier**

295.   Cameron asserts that she never discussed or communicated about Reynolds in any way with Deputy Chief Counsel Sevier. Compl. Ex. 7 (Cameron Dep.) at 98.

296.   Sevier claims they did so communicate.

297.   Cameron further claims, contrary to Sevier, that she never used any physical gestures or body language to communicate to Sevier about Reynolds. Compl. Ex. 7 (Cameron Dep.) at 99.

298.   Cameron also admits that she is unable to deny communicating with Sevier about Reynolds. Compl. Ex. 7 (Cameron Dep.) at 100.

299.   Cameron swears that she and Sevier never discussed Reynolds going back to OCC from OIA.

300.   OCC then-Deputy Chief Counsel Sevier admits that:

My concern regarding Complainant's judgment and maturity was further buttressed by conversations with his last supervisor at FEMA, **Carole Cameron, who expressed significant frustration concerning Complainant's performance and judgment. These conversations occurred prior to the Complainant's termination**

32

**from FEMA**, prior to any knowledge that he had a disability, and prior to any knowledge of EEO activity. Based upon my concerns and those of Carole Cameron, contrasted with the high caliber of applicants OCC was receiving for its vacant positions, I concluded that Complainant's qualifications were not strong enough to consider him for a new position within OCC.

Sevier 2011 Affidavit. Emphasis added. Compl. Ex. 51.

301.   Cameron (ROI at 137) also claims that she has no knowledge of OCC staff members being told to limit contact with Reynolds such that he would not "be allowed to attend social functions even outside of work (such as a holiday party)." Compl. Ex. 52.

302.   However, Mr. Broyles admitted to Nantier (79; Tab F-35 at 483) that someone from External Affairs objected to Nantier's relationship with Reynolds and demanded his exclusion from the OCC holiday party.

**M.  Cameron's Falsely Asserts That she Likes Reynolds**

303.   Cameron shamelessly claims she liked and still likes Reynolds. Compl. Ex. 7 (Cameron Dep.) at 288.

304.   However, on June 1, 2009, Reynolds wrote to her (Compl. Ex. 27) that he was suffering from "severe depression and anxiety for a few months[,]" and further stated: "I also was incapacitated this weekend due to such health ailments. . ."

305.   Cameron subsequently told Jensen that Reynolds needed to be fired.

306.    Cameron also told Lerner in response to the June 1 email: "I see no reason to respond to this."

307.   Later, Cameron continued, "as you can see, he is very unstable. I do not want anything to happen to him, but he is getting out of control. He is on lots of medication etc. and is very difficult to deal with."

308.   Cameron subsequently had Reynolds fired with an unprecedented display of security not used even for those fired for misconduct involving physical violence. See Compl. Ex. 38 (Nantier Dep.) at 70-74.

309.   Even a year later, when all he was asking for was a letter that he could use to verify his prior employment in seeking a job, Cameron emailed Sevier (with whom she (Ex. 7 at 98)

claims never to have even discussed Reynolds) on November 15, 2010 on that subject, as follows: "Adrian: I have had time to think about this, have spoken with Human Capital and also my supervisory reporting chain. I believe Mr. Reynolds has been provided with ample information by Human Capital. International Affairs will not be providing any additional information." Compl. Ex. 27.

310.    The evidence does not support Cameron's contention that she "likes" Reynolds.

**N.    Cameron's Admission That she Would Still Have Fired Reynolds, Even if she had Rated him as Fully Successful in all Four Quarters, Renders "Poor Performance" Immaterial**

311.    Cameron testifies that even if she had found Reynolds to have performed successfully in the third and fourth quarters, as she had in the first two, she still would have fired him. Compl. Ex. 7 (Cameron Dep.) at 239-240.

312.    Thus, it is clear that after he protested Cameron's denial of religious compensatory time and the discriminatory remarks against his co-workers to her boss, and after he revealed his medical condition and stated that he expected to have to file an EEO complaint, Reynolds' performance no longer mattered to Cameron.

**O.    Jensen's False Statements and Actions Clearly Reveal Intent to Obfuscate his—and the Agency's Retaliation Against Reynolds**

313.    As noted, on June 1, 2009, Reynolds and Cameron discussed his contention by phone, and he then commemorated it in an email (Compl. Ex. 27) to her.

314.    Cameron (Compl. Ex. 29) then emailed Jensen, copying him and telling him that Reynolds had just said he was going to go on "long-term medical leave[,]" that he would file an EEO complaint against [her], and he "needs to be terminated."

315.    That same day, Reynolds also copied Jensen on Ex. 9, indicating that "an EEO complaint is likely to follow."

316.    On October 27, Cameron sent (Goldsmith Dec. Ex. 20) Jensen email referencing Reynolds' EEO activity (disability accommodations).

317.    Despite all this, Jensen denies knowing that Reynolds was alleging discrimination in External Affairs until after the firing.

318.    Jensen (Compl. Ex. 53 at 74-75) first testifies as follows:

 Q.  Did there ever come a time when you learned that Mr. Reynolds was alleging that
there was discrimination in the Division?
A.  Not until he filed a Complaint, no.  **Not any time during his employment with FEMA**.
Q.  Only after he was terminated?
A.  That's when it came out.

Emphasis added. Compl. Ex. 53 at 74-75.

319.   Upon being shown that his statement is inaccurate, Jensen is asked why he testified

inaccurately earlier in the deposition, and (Compl. Ex. 53 at 93-94) responded as follows:

Q: Why did you testify this morning that Mr. Reynolds, you didn't know that Mr. Reynolds
thought there was any discrimination prior to learning that after he was fired?

A.  What -- so I'm trying to recall.  So **what I said, I believe I said was I had no specific
knowledge of a specific allegation -- right --** through the EEO process until later.  **Right?**
In which obviously **this came about as an EEO investigator asked me for a statement and
asked me for information**.  Prior to that, you know, employees can go to ERO, they can do
a lot of things but **until they actually file something, you know, I can't say
oh, I know that there's something been filed until it comes through the EEO process**.
Q.  Is there anything else you'd like to say to add to or qualify your testimony about when
you found out that Mr. Reynolds thought there was discrimination afoot in External
Affairs?

A.  No.

Emphasis added. Compl. Ex. 53 at 93-94.

320.   Jensen denies that Jensen Ex. 5 refreshes his recollection, insisting (95) that his earlier

testimony was not inconsistent.

321.   Regarding his April 13, 2009 meeting with Reynolds, Jensen (72-73) claims there was

**no mention of Cameron or discrimination in the meeting**; that Reynolds did not even criticize her

management style.  Compl. Ex. 53 at 72-73.

322.   Reynolds contradicts this, however, pointing out the key (74-75) detail that Jensen

asked him argumentatively why Linda Carpenter wasn't complaining for herself. Compl. Ex. 53 at

72-73.

323. For his ROI Affidavit, Jensen (Tab F-5 at 169) was asked in Paragraph 18:

"Complainant alleged that in May 2009, his management official issued a threat to [him] against

exercising [his] EEO rights during his third quarter performance review. Please provide a response

to this issue fully." He answered: "I have no knowledge of this issue. . ." Compl. Ex. 54.

324.   Reynolds had directly sent Jensen Cameron the June 1 email referencing the threat (Compl. Ex. 27) and Reynolds' follow-up email to Jensen of June 4, at which time he reiterated that Cameron had threatened him:

> Forgive me for being more paranoid now, **but I take threats, however inappropriate I feel they may be, or if they were out of venting, seriously. Thus, if I am truly not going to make it through my probationary period**, 11.0 matter how hard I try or efforts I make or despite quality work, then I need all the accrued annual leave as a lump slim to pay cobra and other things if I am separated.

Compl. Ex. 66 (Emphasis added).

325.   So Jensen knew Reynolds was alleging threats.

326.   However, Jensen did nothing to help Reynolds with regard to threats.

327.   In Jensen Ex. 3 ¶32, at p. 173, Jensen was asked as follows: "Complainant alleged he was subjected to harassment and a hostile work environment. Did Complainant notify you that the conduct was unwelcome? How were you notified? What did Complainant write or say to you?" Jensen answered: "No. He did not write or say anything to me directly about his concerns or perceptions."

328.   In his (Compl. Ex. 53 at 85-87) deposition, Jensen claimed to have "no idea" what threats Reynolds was referring to, despite having already (83) been shown Complaint Exhibit 54. Jensen (23-24) even asserts that when Reynolds (Compl. Ex. 36) referenced making a Congressional complaint against Internal Affairs on November 4, 2009, Reynolds had not yet protested up his chain of command regarding "abuse of authority" and "violation of law."  Compl. Ex. 53 at 23-24, 83, 85-87.

329.   Jensen admits that he did not and would not try to develop an understanding prior to the firing, of what the wrongful discrimination was that Reynolds (Jensen Ex. 4) was referring to in the November 2 email. Compl. Ex. 53 at 91-92; Compl. Ex. 36.

330.   Confronted with the November 2 email, Jensen (92-93) says he's "sure" he would have asked Cameron about the allegations, but claims to forget everything that was said by either of them about it. Compl. Ex. 53 at 92-93.

331.   Jensen (77) also refers to Dr. Greenberg's letter on Reynolds' disabilities as "too much information." Compl. Ex. 53 at 77.

332.   Jensen's described actions and statements are probative of, indeed central to, Reynolds' claims of disability discrimination and retaliation under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Twombly v. Bell Atlantic*, 550 U.S. 544, 570 (2007).

**P.   Cameron Failed to Afford Reynolds an Opportunity to Improve, Thereby Undermining her Performance-Based Alibi**

333.   Cameron (72) claims she gave Reynolds every opportunity to improve and meet expectations. Compl. Ex. 7 at 72.

334.   However, though required to, Cameron failed to give Reynolds a performance improvement plan. Cameron (Compl. Ex. 55) actually drafted such a plan, but apparently recognizing its lack of merit, failed to ever give it to Reynolds.

335.   Hoburg also told Nantier (57) that she never heard of any circumstances for why Reynolds was not put on a PIP. Compl. Ex. 38.

336.   The third quarter review told Reynolds through its narrative that his performance was unchanged from the successful second quarter in all areas—completing tasks, quality of work, problem solving, communication, coordination and teamwork, except one. See Compl. 44-45.

**Q.   External Affairs Protests Nantier-Hopewell's Relationship With Reynolds and his Invitation to the OCC Holiday Party; Reynolds is Disinvited From the Party; Martinet and Broyles Shun Reynolds; OCC Rejects Reynolds' Applications**

337.   By email, Jensen complained to OCC Chief Trissell, about Nantier-Hopewell's friendship with Reynolds. Compl. Ex. 56 (Trissell Dep.) 27-28; Compl. Ex. 57 (Hoburg Dep.) at 61-63. Sevier (Comp. Ex. 1 — Sevier May 27, 2015 Dep. At 43-47) says he forgets whether he was aware of this. Broyles told Nantier (Compl. Ex. 38 at 79) that they had reviewed Reynolds' emails and were concerned that OCC would not zealously represent External Affairs against Reynolds because of hers and OCC's relationship with Reynolds (even though Nantier is not herself an attorney).

338.   Broyles told Nantier that failing to disinvite Reynolds from the OCC holiday party would indicate to External Affairs that OCC would not properly represent its client, External Affairs.

339.   Broyles instructed Jean Hardin to disinvite Reynolds from the holiday party. *Id.*

340.   The Jensen complaint carried sufficient weight at OCC that Reynolds was indeed disinvited from the party in December 2009. *Id.*

341.   However, Chief Counsel Sevier, who was Broyles' superior (Compl. Ex. 1 at 48), as well as Jensen (Compl. Ex. 54 at 167) and Cameron (Compl. Ex. 52 at 137), all deny any knowledge of that.

342.   Sevier swears that he never had a perception that it would cause a problem in relations with external to hire Reynolds. Compl. Ex. 1 (Sevier May 27, 2015 Dep) at 47.

343.   However, he does not deny that a conversation may have occurred about being inhibited in hiring Reynolds by conflict with External Affairs. Compl. Ex. 1 (Sevier May 27, 2015 Dep.) at 46-47.

344.   Sevier claims that Broyles having Reynolds disinvited from the party makes no sense to him. Compl. Ex. 1 (Sevier May 27, 2015 Dep.) at 51.

345.   On at least one or two occasions, around December 2009 and January 2010, Reynolds wrote Mary Ellen Martinet, Edward Broyles and Adrian Sevier expressing concern about retaliation from the Office of Chief Counsel, copying Paul Conrad, the Agency's ethics counsel.

346.    A number of co-workers, including Quinn Lucie, Jackie Nantier-Hopewell, Jean Hardin and Kim Hazel, told Reynolds to expect to be shunned. Compl. Ex. 59 (Reynolds 2015 Dep.)  at 91-92.

347.   Sadly, their predictions came true.

**VII.    AFTER TERMINATION, REYNOLDS IS SUBSEQUENTLY RETALIATORILY DENIED SELECTION TO RETURN TO THE AGENCY**
**A.  Chief Counsel Brad Kieserman Enters on Duty**

348.   Brad Kieserman (http://www.fema.gov/leadership/brad-j-kieserman) was new to the Agency when he became FEMA's Chief Counsel before January 6, 2010 (though the Agency attempted to portray it as March 2010), merely days after Reynolds' firing. Compl. Ex. 10 (Reynolds May 13, 2015 Dec.); Compl. Ex. 65 (Affidavit of Liebross).

349.   On April 22, 2010, Nantier wrote to Reynolds, in part praising Kieserman, who had made a very positive first impression on her.

350.   However, just two days later, April 24, Nantier wrote another email to Reynolds stating: "JEFF, DO NOT SEND NOTE TO KIESERMAN. TALK TO ME FIRST. SEE YOU TOMORROW."

351.   Nantier says she now forgets what happened to lead to this change.

352.   On April 8, 2010, Reynolds learned that he was rated "unqualified" for a GS-090S-14 CORE General Attorney position (Announcement No. CB-20101090). Compl. Ex. 13 at 108.

353.   On May 11, 2010, Reynolds learned that he was not selected for the General Attorney, GS-0905-14 CORE position (Announcement No. CB-20101179). Compl. Ex. 13 at 108.

354.   Reynolds wrote an email to Sevier, then the Deputy Chief Counsel, on or around April 28, 2010, discussing his pending formal EEO complaint against the Agency including its disability aspect.  Compl. Ex. 10 at JR 3033-3034.

355.   Sevier saw that email.  Compl. Ex. 1 at 58-59.

356.   Yet, in Sevier's June 22, 2010 declaration, he denied knowledge of both Reynolds' disability and EEO activity. Compl. Ex. 67 at 199-201.

357.   However, Sevier had received a litigation hold letter on January 6, 2010 pertaining to Reynolds.

358.   For CB-20101179, Sevier states that Reynolds' application was within the group of candidates OCC received for consideration, but admits that Reynolds was not selected for an interview.

**B.**      **Sevier Announces Expectation of Hiring for 15 new Positions Shortly, as of June 30, 2010; Liebross Avers That Reynolds has Been Harassed; the First ROI is Transmitted**

359.   On June 30, 2010, Sevier sent out an announcement stating that he expected to hire for 15 new positions shortly. Compl. Ex. 1 (Sevier May 2015 Dep.) at 6; Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing), p. 13, Agency Alleged Fact No. 75.  It was not sent to Reynolds, who received it anyway. It was, however sent to Elizabeth Blair.

360.   In July 2010, Audrey Liebross executed an affidavit through the EEO office in Reynolds' first case. Compl. Ex. 65 (Liebross ROI Declaration). Liebross said she thought Reynolds had been a victim of harassment.

361.   That same month, the first Reynolds ROI investigation was completed.  The ROI was transmitted on October 1, 2012.

## C. Reynolds Applies for Numerous Positions in Summer 2010, but Receives no Interviews

362.   As reflected in the ROI, it is undisputed that in or around July 16, 2010, Reynolds applied for the following positions: Attorney-Advisor, GS-0905-13/14, Disaster Response (position one); Attorney-advisor, GS-0905-l3/14, Disaster Response (position two); Attorney-Advisor, GS-0905-13/14, Disaster Response (position three); Attorney Advisor GS-0905-13/14, Disaster Response (position four); Attorney-advisor GS-0905-13/14, Disaster Response (position five); Attorney-advisor, GS-0905-13/14, FOIA; Attorney-Advisor GS-0905-13/14, Field Attorney Cadre Support; Attorney-Advisor, GS-0905-13/14, ADR Cadre Support.

363.   Martinet, Reynolds' former supervisor, was   the selecting official for the numerous Field Cadre and CORE Disaster Response positions (Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing, p. 12-13, Agency Alleged Fact No. 66, 76) though Sevier (Compl. Ex 42 at 10-11) and Kieserman (See Compl. Ex. 42 at 13) had to approve her picks. Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing, p. 12-13, Agency Alleged Fact No. 66, 76.

364.   Reynolds had emailed Sevier about his EEO case on April 28, 2010 (Compl. Ex. 10 at JR 3033-34), and Sevier claims he had had told her back in 2009 that he would not approve selection of Reynolds. See Compl. Ex. 54 at 176.

365.   Reynolds received no interviews from any of these applications.

366.   On August 31, 2010, Sevier released a vacancy announcement for various Regional Counsel positions.

367.   On October 25, 2010, the EEO Counselor informed Sevier that Reynolds was seeking counseling. Compl. Ex. 70 at 46-47.

368.   On October 25, 2010, Broyles and Sevier were interviewed by the EEO counselor.

369.   Sevier told the counselor that he makes the initial decision of which resumes are forwarded to the hiring manager. Compl. Ex. 70 at 46-47.

370.   On October 27, 2010, Martinet (ROI at 47) told the EEO counselor that Reynolds lacked sufficient experience, and added that Mr. Reynolds was a high maintenance employee and simply was not a good fit. Compl. Ex. 70 at 47-48.

**D.   Reynolds Applies for Regional Counsel Positions, but Gets Zero Interviews**

371.   On or around November 11, 2010, Reynolds applied for the following 9 Regional Counsel positions (Compl. Ex. 58) in 8 regions: Attorney-advisor, GS-0905-12/13, Intergovernmental Affairs; Attorney-advisor, GS-0905-12/13, Individual Assistance [recovery branch]; Attorney-advisor, GS-0905-12/13, Individual Assistance (position two); Attorney-advisor, GS-0905-12/13, Individual Assistance (position three); Attorney-advisor, GS-0905-12/13, Public Assistance; Attorney-advisor, GS-0905-12/13, Public Assistance (position two)— Comp. Ex. 71.

372.   It is undisputed that he received no interviews for any of these applications.

**E.   Deputy Chief Counsel Sevier and Chief Counsel Kieserman Act as Selecting Officials**

373.   In the 2010 selection of Pat Hogan, Kieserman had the" ultimate veto power." Compl. Ex. 42 (Martinet 5/22/2015 Dep.)  at 48; Comp. Ex. 72.

374.   Martinet admits that she probably conversed with Kieserman about Reynolds, and does not deny that Kieserman may have told her his views on re-hiring Reynolds. Ex. 42 (Martinet 5/22/2015 Dep.) at 12-13.

375.   Martinet admits that **if Kieserman told her that he didn't want Reynolds, that would have influenced her** and she would have been discouraged from doing it unless she had a very strong reason to advocate. Compl. Ex. 42 (Martinet 5/22/2015 Dep.) at 13-14.

376.   Martinet admits that she probably discussed selectees with Kieserman and/or Sevier. Compl. Ex. 42 (Martinet 5/22/2015 Dep.) at 49.

377.   When Martinet was selecting candidates for positions, it was routine for her to be in dialogue with the Chief Counsel and/or Deputy Chief Counsel about them. Compl. Ex. 42 (Martinet 5/22/2015 Dep.) at 50.

378.   Deputy Chief Counsel Sevier has twice sworn that he told Martinet that he would not bring back Reynolds.

379.   Martinet says she does not deny it, but does not specifically recall that happening. Compl. Ex. 42 (Martinet 5/22/2015 Dep.) at 18-19.

380.   Kieserman (Compl. Ex. 61 at 40-42) admits to participating in reading resumes, selecting interview candidates, and participating in interviews for GS-13 and 14 attorneys.

381.   However, he says that normally the Associate Chief Counsel of the division in question would make the selection.

382.   Interviews would be conducted by some combination of Kieserman, Sevier, Katchka for regional positions. Compl. Ex. 61 at 44.

383.   Kieserman also participated in the interviews for deployable field counsel. Compl. Ex. 61 at 44.

384.   For instance, Kieserman participated in the selection of Pat Hogan.  Compl. Ex. 61 at 46; Compl. Ex. 73.

385.   Martinet sought approval from Sevier and Kieserman for hiring of Hogan, Stewart, Blair, Sislen, Senn and Hill. Compl. Ex. 72.

386.   On September 14, 2010, Kieserman approved. Compl. Ex. 72; Compl. Ex. 15. (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing, p.13 (Agency Alleged Fact No. 79).

387.   Kieserman knew that Reynolds was applying, certainly by July 2010. Compl. Ex. 74.

388.   On November 11, 2010, Reynolds reminded Greten, Sevier, Martinet and others that he was interested in and attempting to apply for any OCC attorney positions. Compl. Ex. 71.

389.   Continuing to pursue his case, he further informed them about his disability status by attaching a letter from Dr. Greenberg. Compl. Ex. 49 at 263-267.

**F.   Reynolds is non-Selected for all the 2010 Openings Under Martinet, in Favor of Candidates for Whom the Selecting Official Will not Vouch**

390.   Martinet never interviewed, much less selected, Reynolds for anything.

391.   Two of Martinet's selectees were Elizabeth Blair (Attorney-Advisor, GS 13/14/ CORE--deployable field counsel— Compl. Ex. 42 (Martinet Dep.) at 55-- and Jeff Webb (CORE Response and Recovery Division Individual Assistance Group staff attorney— Comp. Ex. 42 (Martinet Dep.) at 14.

392.   Martinet admits that she is unable to claim that they were better candidates than Reynolds, who was not even interviewed. Comp. Ex. 42 (Martinet Dep.) at 54-58.

393.   Martinet sought authorization from Kieserman and Sevier to select Blair for one of the five Attorney-Advisory, CORE Disaster Response positions —which were not publicly announced—on September 10, 2014. Compl. Ex. 41 (Martinet Dec.) at 77.

394.   It is undisputed that similar courtesy was never extended to Reynolds. Ex S. at 65, 84-85. Indeed, Reynolds was never even interviewed. (Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing, p.13 (Agency Alleged Fact No. 78).

395.   Webb was selected for one of seven Response and Recovery, Attorney-Advisor positions in November 2010. Compl. Ex. 62.

396.   He had not previously worked for FEMA (Compl. Ex. 42 at 21), and had two years' experience practicing law with a private firm in North Carolina.

397.   However, one of his qualifications apparently was that he was the triathlon teammate of Martinet's subordinate-- Erin Greten's—husband.

398.   Martinet could not deny that he may have benefited from favoritism. Compl. Ex. 42 at 79-81.

399.   Webb applied in November was interviewed in mid-November (Compl. Ex. 63) for the position, and Sevier and Martinet were apprised of his status in an ongoing fashion.

400.   Asked why Reynolds was not interviewed for the Response and Recovery position obtained by Webb, Martinet blamed Greten (who had not previously worked with Reynolds as had Martinet), who allegedly said (Compl. Ex. 42 (Martinet Dep.)  at 24-25), that she didn't think Reynolds was "that great a worker."

401.   Martinet (Compl. Ex. 42 at 25) forgets how she responded to Greten.

402.   On November 12, 2010, Sevier approved the selections of candidates Lubin, Caitlin O'Halloran and Dorn. Compl. Ex. 63).

403.   By November 29, Greten and Martinet had selected Webb, Lubin and O'Halloran. Compl. Ex 75.

404.   Around December 6, 10 DAE's were recommended and apparently accepted by Martinet. Compl. Ex. 76.

405.   On November 15, 2010, Cameron (Compl. Ex. 27) wrote to Sevier with whom she claims never to have even discussed Reynolds) on the subject of Reynolds' request for a letter confirming his employment, to assist him in trying to find a job, as follows: "Adrian: I have had time to think about this, have spoken with Human Capital and also my supervisory reporting chain. I believe Mr. Reynolds has been provided with ample information by Human Capital. International Affairs will not be providing any additional information." Compl. Ex. 7 (Cameron Dep.) at 98.

### G.  Kieserman Asserts That he Will not Hire Reynolds Because of Reynolds' Case; Sevier Disclaims Knowledge of Reynolds' Protected Activities; Reynolds Continues Pursuing his Case

406.   On December 14, 2010, Kieserman told Liebross that he would not select Reynolds. Compl. Ex 65; Compl. Ex. 68.

407.   As she reports and he specifically refuses to deny, on December 14, 2010, during an OCC lunch at the Holiday Inn, Audrey Liebross, Deputy Associate Chief Counsel for Contracts and Fiscal Law, told Brad Kieserman, the Chief Counsel, that she believed she should recuse herself from deciding whether to interview Reynolds for a position, "because Jeff and I were friends and I could not be sufficiently objective."

408.   Kieserman answered that she "didn't need to worry about whether or not to recuse herself since he would not hire Jeff Reynolds."

409.   Liebross adds that he "specifically noted that Jeff was litigating against the Agency."

410.   Liebross reports that she understood the Chief Counsel to be saying that he would not hire Reynolds "because he was litigating against FEMA." Emphasis added. Compl. Ex. 68; Compl. Ex. 81 at 200-202.

411.   See Compl. Ex. 61 (Kieserman Dep.) at 13-26, where Kieserman declines to deny each component of Liebross' account, and instead asserts that he forgets whether the incident occurred or not.

412.   Kieserman may have told Martinet something similar; Martinet will neither admit nor deny it (Compl. Ex. 42 (Martinet Dep) at 12-13), but admits that if it was said, it would have influenced her.  Compl. Ex. 42 at 13-14.

413.   As of December 20, 2010, there were still two open positions in Martinet's Response and Recovery Division. Compl. Ex. 77.

414.   However, Reynolds was not even interviewed.

415.   Martinet and the other Deputy Chiefs Counsel would have regular meetings with Kieserman to discuss the ongoing hiring process. Compl. Ex. 76 at 51-52.

416.   Kieserman admits that he lacked any opinion as to whether Reynolds was a suitable candidate. Compl. Ex 61(Kieserman Dep.) at 19, 26.

## H.  Deputy Chief Counsel Sevier Tells Martinet and Farley, That he Will not Approve re-Hire of Reynolds

417.   Sevier was empowered to approve Mary Ellen Martinet's selections for positions. Compl. Ex. 78 (Martinet Dep.) at 10-11.

418.   Though he has also denied it, Sevier has twice admitted that he told Martinet and Farley that he would not approve re-hire of Reynolds at OCC.

419.   Sevier dates his statements to within a few months of June 2009. Compl. Ex. 1 (Sevier May 27, 2015 Dep.) at 10-13; 24; 41-42.

420.   Sevier is unsure as to whether or not he has subsequently discussed his view that he would not approve re-hire of Reynolds with Martinet or Farley with them again. Compl. Ex. 1 (Sevier May 27, 2015 Dep.) at 24.

421.   Sevier is unsure if he told Broyles, Hoburg or others that he would not approve Reynolds' re-hire.  Sevier (Compl. Ex. 1 — Sevier May 27, 2015 Dep at 11-13).

422.   Sevier says he has never reconsidered his views (Ex. L at 24) on rehiring Reynolds, which were never a secret. Sevier (Compl. Ex. 1 — Sevier May 27, 2015 Dep at 33-34).

45

423.   Though he told her he would not re-hire Reynolds, Sevier suggested to Reynolds that he seek employment from Martinet.  Comp. Ex. 1 (Sevier May 27, 2015 Dep.) at 41-42.

424.   Sevier also suggested that Reynolds inquire with Broyles.  Compl. Ex. 1 (Sevier May 27, 2015 Dep.) at 41-42.

425.   However, Broyles ignored Reynolds' inquiry.

426.   Sevier's statements and actions and are probative of, indeed central to, Reynolds' claims of disability discrimination and retaliation, because, as to causality, pretext and motive, such misleading and false statements and actions provide "factual content that allows the [fact-finder] to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" and "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Twombly v. Bell Atlantic*, 550 U.S. 544, 570 (2007).

### I.   The Agency Announces Assistant Regional Counsel Positions in 2011 Under Kieserman and Sevier; Reynolds Applies and is Well Qualified but is not Invited to Interview

427.   On November 17, 2011, the Agency generated announcements for General Attorney (Assistant Regional Counsel in Regions 1, 2, 5, 8 and 10). Ex. V-4-- Katchka Ex. 4. One year of specialized legal experience was required to apply.

428.   Other announcements were also generated that same day. See Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing), p. 9 (Agency Alleged Fact No. 46).

429.   The announcements sought candidates qualified for at least the GS-13 level. Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing), p. 10 Agency Alleged Fact No. 49.

430.   It is undisputed that Reynolds' name appeared on all the resulting certificate lists; After all, he possessed nearly a year of FEMA lawyering experience, something only one other candidate possessed.

431.   Reynolds had been licensed to practice law for approximately seven years and practiced through much of that time, far more than candidates like Carlisle and Belfi, and had also worked for a federal judge and in private firms.  See Compl. Ex 82-83.

432.   Nonetheless, he received no interviews.

**J.   The Agency is Repeatedly Placed on Notice to Preserve Assistant Regional Counsel Selection Process Documents, but Destroys Them Anyway**

433.   The certificates of eligibles for the Assistant Regional Counsel positions were issued between January 20 and 24, 2012. Compl. Ex. 16 at 6-7; Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing) p. 9-10 (Alleged Facts 47,55).

434.   Reynolds' name appeared on all relevant lists.

435.   On February 2, 2012, the Agency (Ex. 7) responded to Reynolds' Interrogatories. The relevant selections were then made in 2012.

436.   On January 18, 2012, Laketa Lewis of ERO requested the announcement, cert list, interview notes, current status, selectee, and applications for each of the Assistant Regional Counsel positions. Compl. Ex. 84.

437.   As of February 12, 2012, selections had not yet been made for six Assistant Regional Counsel positions. Compl. Ex. 60 (Katchka Dep.) at 6-7.

438.   There is no question that Katchka (Compl. Ex. 60 (Katchka Dep.) at 95-96) had kept notes.

439.   But Katchka (Compl. Ex. 60 (Katchka Dep.) at 54-55, 72, 80-82) and others claim to have thrown away those notes, precluding them from ever being produced.

440.   Although the Agency was already on repeated specific notice that it was being asked for these particular interview notes, and had been asked to explain if any documents were destroyed or missing.

441.   On June 21, 2013, undersigned sought documents in the second EEO case pertaining to numerous selection processes.

442.   On August 26, 2013, the Defendant responded.

443.   On 4/27/2015, the Administrative Judge ruled on Mr. Reynolds' Motion to Compel in part as follows:

Document Request No. 2: all documents related to the vacancies.  To the extent not already provided to Complainant (see E, above), the agency must provide materials used in its

selection process for the vacancies at issue.  Applications of selectees must be provided. However, SF-50s of any of the selectees (or any other applicants) need not be provided, unless they were available to and actually used by recommending and selecting officials. Crediting Plans and the like need not be provided.  *Fausto v. Dep't of the Interior,* EEOC Request No. 05950181 (May 9, 1996); *see also NTEU v. Customs Service*, 802 F.2d 525 (D.C. Cir. 1986) (Crediting plans are not subject to a FOIA request).  **Any notes made or forms used for interviews are to be produced**.  Where a vacancy announcement was canceled or otherwise not filled, the Agency is to provide any documentation explaining that action. The agency does not have to provide any information for vacancies Complainant did not apply for.

Compl. Ex. 85 (Emphasis added).

444.   However, regarding the Assistant Regional Counsel positions that were in question, at a minimum, the Agency has never produced any interview questions or notes, or its short lists and attendant notes, having discarded them after it received specific demand for their production.

### K.   One Selectee, Jennifer Carlisle for Region 1 in Boston, Fails to Meet the Basic Qualifications set Forth in the Announcement

445.   Lisa Katchka was the Deputy Associate Chief Counsel for the Program Law Division.

446.   Katchka was delegated primary responsible for hiring for Assistant Regional Counsel, by Chief Counsel Brad Kieserman and Deputy Chief Counsel Adrian Sevier.

447.   Katchka ((Compl. Ex. 60) at 101) generated the short lists and made recommendations to Sevier (Compl. Ex. 1 — Sevier May 27, 2015 -- Dep. at 127-128) and Kieserman for the Assistant Regional Counsel positions. See Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing), p 10 (Agency Alleged Fact No. 51).

448.   Katchka and her deputy Chad Clifford, participated in "paring down" the cert lists to short lists of candidates to be interviewed. Compl. Ex. 60 (Katchka Dep.) at 14, 22-23, 41.

449.   Katchka would then participate in interviewing those candidates. Compl. Ex. 60 (Katchka Dep.) at 15.

450.   Katchka (Compl. Ex. 60 at 23-24, 111) admits that she may have seen Reynolds' resume during the selection process and put his in the pile of those who would not make the "short list."

451.   However, although his name was forwarded on multiple certificates between January 20 and 24, 2012 as qualified, Katchka testifies that Reynolds' name did not appear on any short lists.  Compl. Ex. 60 (Katchka Dep.) at 47; Compl. Ex. 84.

452.   Katchka asserts that Reynolds had no particular strikes against him as a candidate. Compl. Ex. 60 (Katchka Dep.) at 15-16.

453.    Nonetheless, Katchka admits that she may have personally cut Reynolds outside the short lists.   Compl. Ex. 60 (Katchka Dep.) at 23-24, 111.

454.   Katchka asserts that she did not know that Reynolds had been terminated from External Affairs (Compl. Ex. 60 (Katchka Dep. at 29)), so that played no factor in Reynolds' rejection.

455.   All those short lists were destroyed (Compl. Ex. 60 (Katchka Dep.) at 47), in approximately spring 2013 (Compl. Ex. 60 (Katchka Dep.) at 54).

456.   For Region 1 (Boston), Katchka (Compl. Ex. 60 (Katchka Dep.) at 101) claims that Jennifer Carlisle was the best qualified person for the position of Assistant Regional Counsel in Region 1 (Boston), and that Katchka recommended Carlisle up the chain to Sevier and Kieserman over Reynolds.

457.   In August 2011, Carlisle had obtained her first legal job as a fellow. Carlisle submitted a CV dated to 11/20/2011.  Compl. Ex. 60 (Katchka Dep.) at 106-107.

458.   Though the Announcement (ROI 289) made one year of legal experience mandatory, Katchka (Compl. Ex. 60 (Katchka Dep.) at 104-108) had to concede that Carlisle lacked that mandatory qualification.

459.   Confronted with the fact that Carlisle could not even come within thirty days of satisfying the requirement, Katchka (Compl. Ex. 60 (Katchka Dep.) at 107-108) testified that "that's why we didn't offer her at the 13."

460.   Indeed, documents reflect the fact that after announcing the position at the GS-13 level, the Agency ignored its own requirements and got around the one-year of experience requirement by hiring Carlisle as a GS-12. Compl. Ex. 86.

461.   In the meantime, Katchka admits that she may have seen Reynolds' resume (Ex. CCC) during the selection process and put it in the pile of "short list" rejects.  Compl. Ex. 60 (Katchka Dep.) at 111.

462.   Katchka (Ex. 60 (Katchka Dep.) at 129-130) admits that Reynolds had more significant legal experience than Carlisle. Compl. Ex. 60 (Katchka Dep.) at 129-130.

463.   Carlisle was not disabled and had not protested discrimination by the Agency. Compl. Ex. 60 (Katchka Dep.) at 109.

**L.   Another Selectee, Caitlin O'Halloran, Also Lacked the Year of Experience**

464.   Caitlin O'Halloran was recommended for Region 10 (Seattle). See Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing), p. 12 (Agency Alleged Fact No. 64).

465.   She, like Carlisle, also lacked a full year's experience when she was hired for this position, as her first regular job as a lawyer began in February 2011.  Compl. Ex. 60 (Katchka Dep.) at 110.

466.   O'Halloran was the only applicant for this position other than Mr. Reynolds who had previous FEMA experience.

467.   While that experience helped O'Halloran get selected, Katchka denigrated its importance when discussing Reynolds. Compl. Ex. 60 (Katchka Dep.) at 117-118.

468.   Katchka destroyed the notes from O'Halloran's interview. Compl. Ex. 60 (Katchka Dep.) at 72.

**M.   Another Selectee, Ms. Belfi, had no Federal Experience**

469.   Katchka (See Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing), p.11 (Agency Alleged Fact No. 58) recommended Catherine Belfi over Reynolds for Region 2 (New York) on May 4, 2012, and (Compl. Ex. 60 (Katchka Dep.) at 84) claims Belfi was the best qualified candidate.

470.   However, Katchka claims to forget why Belfi made the short list but Reynolds didn't. It is undisputed that Belfi had no federal experience at all, and just two years at a private firm.

471.   Katchka testified that it was "debatable" whether Belfi showed more meritorious and valuable legal experience than Reynolds.

472.   When asked —with the resumes in front of her (Compl. Ex. 60 (Katchka Dep.) at 131-133)-- why, then, Belfi made the short list and Reynolds didn't, Katchka (Compl. Ex. 60 (Katchka Dep.) at 130-131) tellingly answered: "I don't recall."

473.   Katchka (Compl. Ex. 60 (Katchka Dep.) at 131-132) also admitted that her Deputy, Chad Clifford, might have sought feedback on Reynolds' resume, but she forgets.

474.   Katchka admits to "throwing away" the relevant documents, which she says no longer exist. Compl. Ex. 60 (Katchka Dep.) at 80-82.

**N.   Reynolds is Denied Still More Selections**

475.   Mr. Reynolds applied for the position of CORE Trial Attorney, GS-0905-13, (Job 20) applied under Announcement#: MG-2013-9932-MJH-860218COR, on March 20, 2013 through USAJOBS.

476.   The position permits promotion potential only to the level of GS-13. Compl. Ex. 88.

477.   The candidate selected was Caroline Hong. Compl. Ex. 89.

478.   The Agency identified Kim Farley as the selecting official. Compl. Ex. 89.

479.   However, Farley denies ever serving in that capacity.

480.   Ms. Hong graduated from law school in May 2008.  Comp. Ex. 90.

481.   She had been in an attorney position between November 2012 and March 2013 at the Department of Labor. Compl. Ex. 90.

482.   Between July 2011 to November 2012, Ms. Hong held an executive position relating to policies for broker-dealer trading and employee trading.  She also provided legal advice relating to research products and trading exemptions.

483.   Between September 2008 and June 2011, Ms. Hong states that she "[r]esearched and drafted legal memoranda of law, briefs, motions and pleadings on complex issues on topics in federal and state substantive and procedural law."

484.   Mr. Reynolds graduated law school in 2003.  Compl. Ex. 91.

485.   Thus he possessed approximately five more years of legal experience than Ms. Hong.

486.   Mr. Reynolds served as a trial attorney for the Agency for 11 months (Compl. Ex. 91). This was twice long as Ms. Hong.

487.   Ms. Hong had no experience working for the Defendant prior to the selection at issue.

488.   Mr. Reynolds also applied for a CORE Trial Attorney, GS-0905-13, under Announcement#: MG-2013-9107-MJH-860262COR, on March 20, 2013.

489.   Mr. Reynolds was qualified for the position.

490.   The Agency contends that no individual was selected for the CORE Trial Attorney position (Vacancy Announcement No. MG-20139107-MJH-860262COR), but fails to provide any explanation.

491.   There is no non-discriminatory reason why the Agency decided it would rather not fill the position than select Mr. Reynolds.

492.   Mr. Reynolds applied for an Equal Employment Opportunity Specialist position, under Announcement#: MG-2012-T0265-EAM-656989-D, applied through USAJOBS, on or about May 4, 2012.

493.   The Agency asserts that it made no selection for the position.

494.   Upon information and belief, the selecting official for EEO Specialist work would have been Pauline Campbell as head of the Equal Rights Office.

495.   Ms. Campbell's familiarity with Mr. Reynolds' past claims of discrimination is extensive.

496.   Indeed, her office oversaw the counseling, investigation of those complaints and the compilation of the Reports of Investigation.

497.   On December 21, 2011, Sevier averred that he had long since told **at least** two staff members that he would not approve the selection of Mr. Reynolds for an attorney vacancy with OCC because his qualifications were insufficient.

498.   Sevier stated that these staff members are Mary Ellen Martinet and Kim Farley. Compl. Ex. 69 at 176. However, Sevier says he now forgets whether he ever told them that. Sevier (Comp. Ex. 1 — Sevier May 27, 2015 Dep at 15).

499.   Sevier added in the ROI affidavit (Compl. Ex. 69 at 176) that this view was informed by Carol Cameron's significant frustration "concerning Complainant's performance and judgment."

500.   However, he later denied ever discussing those matters with Ms. Cameron.

501.   Sevier said in an affidavit that Reynolds' qualifications were "not strong enough to consider him for a new position[,]" but he later admitted "it's not an issue of qualifications." Sevier (Comp. Ex. 1 — Sevier May 27, 2015 Dep at 16).

## VIII.   THE AGENCY OFFERS ADMISSIONS, IN ADDITION TO FALSE AND PRETEXTUAL EXPLANATIONS, OF ITS REFUSAL TO SELECT REYNOLDS

### A.   Despite Instruction From Its Lawyers and Discovery Requests, OCC Lawyers Destroy Selection Process Documents Including Short Lists and Interview Notes, Despite Already Being in Receipt of Reynolds' Proper Document Requests for Those Very Documents

502.   Defendant promulgated a litigation hold letter in 2010. Compl. Ex. 92.

503.   The Agency was ordered by the AJ to produce all documents in its possession that would indicate knowledge of Reynolds' EEO activity, in April 2015.  Compl. Ex. 85.

504.   However, the Agency failed to immediately comply.

505.   On July 31, 2015, Leigh Hoburg acknowledged the existence of a hold letter. Compl. Ex. 57 at 80

506.   Then, to defend against Reynolds' Motion for Partial Summary Decision, the Agency suddenly produced part of a letter (Compl. Ex. 92) last week, while cutting off whatever additional pages

may exist.

507.   When undersigned noticed that the 2010 hold letter (Comp. Ex. 92) was missing pages and asked (Compl. Ex. 93) for the complete copy, the Agency instead sent over 2012 hold letters (Compl. Ex. 94), which were not even mentioned upon sending the 2010 letter.

508.   The 2012 letters add key names to the list of those who received "hold" notification and underscore by repetition the extent of the notice of duty to preserve.

509.   Chief Counsel Sevier even testified that he could not remember receiving a hold letter. Sevier (Compl. Ex. 1 — Sevier May 27, 2015 Dep at 114).

510.   On January 3, 2012, in EEOC Case No. 570-2011-00190X, undersigned propounded interrogatories and document requests, seeking the Assistant Regional Counsel selection documents and thereby hardening the Agency's pre-existing obligation to ensure that they be preserved. Compl. Ex. 64 hereto.

511.   In Document Request No. 2 (Compl. Ex. 64), undersigned requested the interview notes and all other documents pertaining to all the selections at issue in this case.

512.   Reynolds understood at the time that he was not being selected, or even updated about the status of his job applications by the Agency, and those requested documents were relevant to this Case.

513.   On January 18, 2012, Laketa Lewis of the Equal Rights Office requested announcements, cert lists, interview notes, current status, selectees, and an application for each of the Deputy Regional Counsel positions. Compl. Ex. 84.

514.   On January 20, 2012, certificates were issued for positions in New York (MG-2012-81998-KAS-565367COR - Region II NEW YORK), and Mr. Reynolds' name was forwarded at both grade levels.

515.   That same day, MG-2012-82000-KAS-565378COR - Region V CHICAGO, was issued and again Mr. Reynolds' name was forwarded at both grade levels. See Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing), p.11 (Agency Alleged Fact No. 57).   LEWIS IS SELECTEE by Katchka.

516.   Also on January 20, 2012, a certificate was issued for MG-2012-81997-KAS-560642COR - Region I BOSTON, with Reynolds making the cut at both grade levels.   Compl. Ex. 84; See Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing), p. 11-12( Agency Alleged Facts Nos. 55. 152).

517.   Eligibles were certified, with Mr. Reynolds name on list at No. 306. Compl. Ex. 85.

518.   The certs were thus all issued between January 20 and 24th, 2012. Compl. Ex. 84.

519.   On February 2, 2012, the Agency (Compl. Ex. 97) responded to an Interrogatory (Compl. Ex. 96) in the administrative termination case, identifying the following as persons with knowledge of the facts of the first two non-selections of Reynolds, in the following manner:

Mr. Brad Kieserman – is not expected to testify as a witness in this matter at this time, but if necessary, he **would testify about the selection process for the Region IX regional counsel position and the reasons why the Complainant was not one of the better qualified candidates for the position**, would testify about who in fact was selected for the Region IX regional counsel position and why. Mr. Kieserman is not expected to have any personal information or knowledge about events prior to his accepting the position of FEMA's Chief Counsel in or around March of 2010.

Mr. Adrian Sevier – Mr. Sevier is not expected to testify as a witness in this matter at this time, but if necessary, **Mr. Sevier would testify about the selection process for the two positions accepted and at issue in the Complaint and the reasons why the Complainant, who had served as a line-attorney in FEMA for less than one year, was not the best-qualified candidate** for the positions that he applied for and that he was not even recommended for one of the two positions at issues because Complainant indicated that he did not have an active state bar license, which was a necessary requirement to serving as an attorney for FEMA's Office of Chief Counsel. Mr. Sevier may also testify about his limited discussions with Mr. Fried, if there was in fact any communications with Mr. Trissell about the Complainant, and other matters related to the Complainant's claims.

520.   That same day: Interrogatory No. 4 asked:

**To the extent any document responsive to Complainant's Requests for Production of Documents has been destroyed**, deleted, replaced or is otherwise no longer available, identify the document by including the name and author of the document, the persons responsible for the destruction or unavailability of the document, the persons who actually destroyed or deleted the document or caused it to be unavailable, the reasons for the destruction or unavailability or the document and all persons knowing said reasons, and all documents referring or relating to the document in question.

Identify each person who participated in the preparation of the response, including without limitation, all persons who drafted proposed or actual responses or who provided information or documents to be used in the preparation of responses, identify and describe each file and each document consulted or referred to in the preparation of the answer, and explain how the information was obtained.

521.   The Agency's Response to INTERROGATORY No. 4, on February 2, 2012, was:

Objection. The request is overly broad, vague and ambiguous so as not to be susceptible of an answer. Unless identified by the Plaintiff specifically, the Interrogatory calls for FEMA to speculate as to the existence or non-existence of a

responsive document, and whether or not it was actually destroyed. FEMA cannot guess as to what may or may not have ever existed, and cannot "prove a negative."

Emphasis added.

522.   As of February 12, 2012, selections had not yet been made for six Deputy Regional Counsel positions. Compl. Ex. 84 at 286-287.

523.   At some point after the administrative discovery requests, and after certificates were issued, which included Reynolds' name, Lisa Katchka and Clifford both took a first look at the resumes.  Compl. Ex. 60 (Katchka Dep.) at 41.

524.   Short lists were generated and interviews were conducted.

525.   Katchka admits Reynolds' name did not appear on any of the short lists they created. Compl. Ex. 60 (Katchka Dep.) at 47.

526.   Sometime thereafter—perhaps in spring 2013--, instead of producing those documents to Mr. Reynolds as required in discovery and for the ROI, and pursuant to their own "hold letters" discussed above, Agency lawyers—admittedly—destroyed all the proof of what happened inside that selection process.

527.   Katchka knew Reynolds, having worked with him previously. Compl. Ex. 60 (Katchka Dep.) at 37-38.

528.   Kieserman supposedly wanted to go to a "paperless office." Compl. Ex. 60 (Katchka Dep.) at 52-54.

529.   Katchka says there was (Compl. Ex. 60 (Katchka Dep.) at 51-52, 55) a general instruction from Sevier and Kieserman to clean out the paper files.

530.   Kieserman does not dispute that Katchka threw out the short lists and interview notes. Compl. Ex. 61 (Kieserman Dep.) at 82-83.

531.   Although the Agency was on specific notice that it was being asked for interview notes before it even *interviewed* the selectees, Katchka and others had destroyed and/or lost those notes, precluding them from being produced.

**B.**   **Kieserman and Katchka Admit Spoliation Facts, While Sevier Denies Them**

532.   Katchka admits frankly to the document destruction described immediately above.

533.   Katchka and Clifford generated structured interview notes.

534.   Thus (Compl. Ex. 60- Katchka Dep. 95-96), Katchka would notate on top of the structured interview questions (which have never been produced), and would also put reference information there.

535.   Katchka ( testified that "we probably have that in email[,]" yet, they were never been produced in the EEOC litigation, although they were requested. Compl. Ex. 60 (Katchka Dep.) at 63.

536.   Katchka (Compl. Ex. 60 at 80-83) committed to looking for notes from the selection of selectee Belfi.

537.   However, they have never been produced, and despite the Administrative Judge's prior ruling that these documents were discoverable, Agency Counsel instructed Katchka not to answer at her deposition, on whether she would produce them to her counsel.

538.   Katchka says that in the interview process, she and her team made short lists, and she and deputy Chad Clifford kept custody of the short lists and interview notes until throwing them out. Compl. Ex. 60 (Katchka Dep.) at 54-55.

539.    As noted, however, she swears that Kieserman later told her to clean out the paper files. Compl. Ex. 60 (Katchka Dep.) at 51-52.

540.   Katchka also says she forgets exactly who gave the instruction. Compl. Ex. 60 (Katchka Dep.) at 51-52.

541.   Katchka adds that someone said there was no budget for scanning prior to discarding. Compl. Ex. 60 (Katchka Dep.) at 53, and that the documents were tossed out [around 2013], perhaps the spring. Compl. Ex. 60 (Katchka Dep.) at 54.

542.  Kieserman says he has no reason to dispute that documents thrown out as per Katchka. Compl. Ex. 61 (Kieserman Dep.) at 82-83.

543.   Indeed, documents reflect the fact that after announcing the position at the GS-13 level, the Agency ignored its own requirements and got around the one-year of experience requirement by hiring Carlisle as a GS-12. Katchka (Compl. Ex. 60 at 73) testifies Carlisle's

interview demeanor was a factor in her favor, and that she was "bright and engaged." Compl. Ex. 60 (Katchka Dep.) at 101-102.[2]

544.   Kieserman admits that the Agency failed to send out a litigation hold pertaining to Reynolds. Compl. Ex. 61 (Kieserman Dep.) at 82.

545.   Kieserman admits that he never looked for any Reynolds documents. Compl. Ex. 61 (Kieserman Dep. at 87-88).

546.   Indeed, he testified that no one ever told him about document requests. Compl. Ex. 61 (Kieserman Dep. at 90).

547.   His Chief Counsel predecessor, David Trissell, also admits to never receiving a hold. Compl. Ex. 56 (Trissell Dep.) at 59.

548.   Katchka claims that someone said the budget for scanning had run out. Compl. Ex. 60 (Katchka Dep.) at 53.

549.   However, Kieserman denies awareness of cutting short scanning of paper documents for preservation. Compl. Ex. 61 (Kieserman Dep.) at 88-89.

550.   Sevier (Ex. 14-- 5-27-2015 Sevier Deposition at 122-123) admits that discarding the documents was not appropriate, and says he does not know why Katchka threw out her documents.

551.   Kieserman forgets if there was a litigation hold on Jeff Reynolds Compl. Ex. 61 at 82.

552.   Kieserman says he has never looked Reynolds-related documents Compl. Ex. 61 at 87-88.

553.   He says no one ever told him about Reynolds' document requests prior to his 2015 deposition. Compl. Ex. 61 at 90        .

---

[2]        In this Complaint, undersigned focuses on Jennifer Carlisle as a comparator for Reynolds with regard to Assistant Regional Counsel. While the spoliation impacts Reynolds' claims for several of these positions, and others as well, it would most likely be overkill to spell out how the spoliation and failure to hold documents impacted each and every selection at issue here. Reynolds is entitled to a remedy for failure to select him for all of these positions on account of the spoliation, and Carlisle's selection for Region 1 (Boston) in early 2012 is illustrative.

554. Sevier—in a critical fact dispute-- disagrees with Katchka and Kieserman about the document destruction, testifying that he does not know why Katchka threw out her documents from the Assistant Regional Counsel selection processes. Sevier (Compl. Ex. 1 — Sevier May 27, 2015 Dep at 122-123.

555. Sevier says that he is not knowledgeable of any reason to throw out interview notes / short lists. Sevier (Compl. Ex. 1 — Sevier May 27, 2015 Dep at 117-118.

556. Sevier denies that anyone would have ever told Katchka to destroy her documents (Sevier (Compl. Ex. 1 — Sevier May 27, 2015 Dep at 120-121), and states that is not appropriate.

557. However, no one has asked him to help figure out what OCC discarded. Sevier (Compl. Ex. 1 — Sevier May 27, 2015 Dep at 127.

558. As noted, Leigh Hoburg admits that she did receive a litigation hold for Reynolds documents. Compl. Ex. 57 (Hoburg Dep.) at 80-81.

559. David Trissell says he recalls no litigation hold, however. Compl. Ex. 56 (Trissell Dep.) at 59.

560. Kieserman's, Katchka's, Hoburg's and Trissell's credibility are at issue in adjudicating Reynolds' claims, particularly retaliation. Their described actions and statements are probative of causality, pretext and motive, as misleading and false statements and actions provide "factual content that allows the [fact-finder] to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" and "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Twombly v. Bell Atlantic*, 550 U.S. 544, 570 (2007).

**C. It is Undisputed That Prior Inability to Reach Reynolds was Never a Factor When Sevier Received Reynolds' Later Applications, and that Reynolds' Depression was Sufficient Explanation for not Calling the Agency Back in May 2009**

561. The Agency maintains that it rescinded Reynolds' prior offer under Announcement No. SA-09-391LES3 because it could not reach him in May 2009.

562. However, Sevier admits that this was not a factor in rejection of Reynolds' later applications. Compl. Ex. 78 (Sevier January 27, 2015 Dep.) at 36.

563.   Sevier admits that Reynolds' bout of depression "presumably" would have been sufficient explanation for not calling the Agency back in May 2009. Compl. Ex. 1 (Sevier Dep.) at 67-70.

### D.   The Agency Concedes That Neither Performance Concerns nor Termination by External Affairs, Were Reasons for the non-Selections

564.   The Agency admits—and it is therefore undisputed-- that Reynolds' termination from External Affairs was not a factor in its later failures to select him.

565.   Thus, at his deposition, Sevier admits that he knows nothing about Reynolds' performance record at External Affairs.  Compl. Ex. 1 ( Sevier  1-23-2015 Dep.) at 41-42, implying that Reynolds' External Affairs performance had nothing to do with his rejection for OCC.

566.   Fried, the litigation manager, agrees, stating   that he doubts that Reynolds' termination would preclude his coming back to OCC. Compl. Ex. 17 (Fried Dep.) at 74-75.

567.   Nor have Katchka, Martinet or Kieserman opined as to the quality of Reynolds' performance at External Affairs.

568.   Martinet, whom Sevier admitted telling not to select Reynolds was the selecting official for numerous positions, forgets the contents of any conversations with Sevier about Reynolds returning to OCC around the time of the termination. Compl. Ex. 2 (Martinet 2-11-2015 Dep) at 23-25 28.

569.   Martinet says that her willingness to rehire Reynolds "would depend on the position." Compl. Ex. 42 (Martinet May 22, 2015 Deposition) at 5.

### E.   Sevier has no Legitimate, non-Discriminatory Reason for Blackballing Reynolds; he has Directly Contradicted his own Alleged Alibis

570.   Sevier's described actions and statements are probative of, indeed central to, Reynolds' claims of disability discrimination and retaliation under the principles set forth in *Ashcroft v. Iqbal*, 556 U.S. at 678, quoting *Twombly v. Bell Atlantic*, 550 U.S. at 570.

571.   Sevier admits that *qualifications* were not the reason for blackballing Reynolds. Compl. Ex. 1 — Sevier May 27, 2015 Dep at 10, 21.

572.   This contradicts his (Compl. Ex. 69 at 176-177) December 21, 2011 Affidavit, in which Sevier stated that: "based [in part] on [his] concerns and those of Carol Cameron[,]" he decided Reynolds' qualifications were "not strong enough."

573.   In his January 2015 deposition, Sevier (Compl. Ex. 78 at 60-63) admits that **Reynolds never engaged in any conduct in the workplace that he thought was "inappropriate"**, he had no problem with any of Reynolds' visits to OCC from OEA, and that Reynolds never said anything to him that he found "inappropriate".

574.   At that time, Sevier (Compl. Ex. 1 at 63) then denied under oath that he ever told anyone not to bring Reynolds back.

575.   Sevier (Sevier (Compl. Ex. 1 — Sevier May 27, 2015 Dep at 17)) now claims in May 2015, that Reynolds' contacts with OCC before Reynolds left FEMA in November 2009 had been "inappropriate", thus allegedly explaining his intent to exclude Reynolds.

576.   Regarding the inability to reach Reynolds for a few days to make the earlier job offer, Sevier (Ex. A at 36) admits that was never a factor in any of Reynolds' later job applications; Sevier (Ex. A at 69) admits that if inability to reach Reynolds in May 2009 was because of depression, that would be an entirely reasonable explanation that would eliminate that incident from excluding him from employment. Compl. Ex. 1 (Sevier Dep.) at 36, 69.

577.   However, he (Sevier (Compl. Ex. 1 — Sevier May 27, 2015 Dep at 69-70) says he did not yet know about depression or anxiety diagnosis at the time of the November firing.

578.   This is a questionable assertion, in that his subordinates Fried and Montoya received, a June 4, 2009 letter from Reynolds referencing his depression and indicating that he had not been well enough to take the OCC job at that particular moment. It was sent at 1:55 PM on June 4. Compl. Ex. 33.

579.   At 2:58, Fried wrote to Reynolds that he had done a great job and had been excited to have him back, but could no longer wait. Compl. Ex. 98.

580.   Additionally, Sevier's client at LER Lerner knew, and so did Jensen, Cameron and Garratt.

581.   Upon information and belief, Sevier's subordinates are likely to have informed Sevier.

582.   In his first deposition, Sevier denies discussing Reynolds with Cameron and asserts that nothing she said to him ever impacted his approach to Reynolds. Compl. Ex. 1 (Sevier May 27, 2015 Dep.) at 37-38.

583.   However, in the second, he (Sevier) admits that he did have such discussions. Compl. Ex. 1 — Sevier May 27, 2015 Dep -- at 18-19.

584.   Despite elsewhere (Sevier (Compl. Ex. 1 — Sevier May 27, 2015 Dep at 10-11) testifying that he told Martinet and Kim Farley before the Reynolds firing, that he would not take Reynolds back at OCC, Sevier testified that Reynolds was *eligible* to be brought back around the time of the November 2009 firing.  Compl. Ex. 1 at 36, 78-79.

585.   Why Reynolds could not encumber the position he had previously been selected for has never been explained by Defendant.

586.   In his (Compl. Ex. 1 at 38-39) first deposition, Sevier denied discussing Reynolds with Jensen or receiving any written materials about Reynolds from Jensen.

587.   However, Hoburg's and Trissell's depositions show that that is highly unlikely to be true.

588.   Thus, by email, Jensen complained to OCC Chief Trissell—Sevier's immediate supervisor, about Nantier-Hopewell's friendship with Reynolds. Compl. Ex. 57 (Hoburg Dep.) at 61-62.

589.   Hoburg (Compl. Ex. 57 at 62-65) then met with Jensen and Cameron on the subject. Sevier (Sevier (Compl. Ex. 1 — Sevier May 27, 2015 Dep at. 43-47) now says he forgets whether he was aware of External Affairs' communications with OCC about Reynolds.

## IX. <u>STATEMENT OF CLAIMS</u>

## COUNT I: DISCRIMINATORY AND RETALIATORY FAILURE TO SELECT OR REASSIGN MR. REYNOLDS TO OCC IN 2009, PRIOR TO THE AGENCY'S TERMINATION, ON ACCOUNT OF HIS DISABILITIES, AND FOR ENGAGING IN ACTIVITIES PROTECTED BY TITLE VII, THE ADAAA, AND 29 C.F.R. §1614.101

590.   Mr. Reynolds incorporates all above paragraphs by reference.

591.   As discussed above, Reynolds was seeking an attorney position with OCC in spring 2009.

592.   In fact, he was selected and was awaiting reassignment to OCC to a vacant slot that was subsequently announced through a posting for" Trial Attorney, Job Announcement No. SA-09-391-LES3." Ex. C- EEOC NO:  570-2011-00190X Tab F-1a at 127.

593.   However, as discussed above, the offer was rescinded after OCC personnel became aware of Reynolds' disabilities and protected activities pertaining to Cameron.

594.   The Americans With Disabilities Act and the Rehabilitation Act forbid discrimination in terms and conditions of employment, on account of an employee or prospective employee's covered disabilities.

595.   Reynolds informed Defendant of his anxiety and depression, by telling Cameron and also through a letter from his psychiatrist.

596.   Defendant subsequently rescinded his previously-awarded job offer without a legitimate, non-discriminatory, non-retaliatory excuse that can be shown through preponderant evidence.

597.   Title VII forbids discrimination against an employee because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

598.   Under 42 U.S.C. § 2000e-16, this protected activity may take the form of participation in EEO proceedings, or less formal opposition.

599.   The ADAA similarly prohibits retaliation.

600.   29 C.F.R. §1614.101 makes it unlawful to discriminate against an employee because that employee has opposed any practice made illegal or participated in any stage of administrative or judicial proceedings under 42 U.S.C. 2000e-16 or the Rehabilitation Act and the Americans With Disabilities Act Amendments.

601.   By denying Reynolds the position in OCC in spring 2009, on account of his disabilities and EEO and ADAAA-protected activities, the Defendant unlawfully discriminated and retaliated against Reynolds.

## COUNT II: UNLAWFUL DISCRIMINATORY AND RETALIATORY TERMINATION, IN NOVEMBER 2009, IN VIOLATION OF TITLE VII AND THE ADAAA

602.   Mr. Reynolds incorporates all above paragraphs by reference.

603.   The Agency terminated Reynolds in November, 2009, asserting pretextual reasons, after he disclosed his disabilities and protested discrimination prohibited by Title VII and the ADAAA.

604.   By so doing, the Agency violated Title VII and the ADAAA (see Count I).

## COUNT III:   DISCRIMINATORY AND RETALIATORY FAILURE TO REASSIGN OR RE-HIRE REYNOLDS TO A POSITION WITH OCC IN LATE 2009 UNDER JOB ANNOUNCEMENT NO. SA-09-391-LES3, FOR ENGAGING IN ACTIVITIES PROTECTED BY TITLE VII, THE ADAAA AND 29 C.F.R. §1614.101

605.   Mr. Reynolds incorporates all above paragraphs by reference.

606.   As noted above, on or about July 29, 2009, which was upon his return from FMLA but before the November firing, Reynolds applied for the work he had just missed out on at OCC with Fried; there were two openings posted for Trial Attorneys, under Job Announcement No. SA-09-391-LES3. Ex. C- EEOC NO:  570-2011-00190X Tab F-1a at 127; Ex. N, and Reynolds applied for both.

607.   However, as discussed above, Sevier had concluded that Reynolds would not be allowed to transfer Reynolds was denied selection after OCC personnel became aware of Reynolds' disabilities and protected activities pertaining to Cameron.

608.   By denying Reynolds selection under the Announcement described, in OCC, on account of his disabilities and EEO and ADAAA-protected activities, the Defendant unlawfully discriminated and retaliated against Reynolds. (see Count I.)

**COUNT IV:   DISCRIMINATORY AND RETALIATORY FAILURE BY FEMA'S
OCC, TO RE-HIRE REYNOLDS IN 2010, TO A POSITION WITH ITS FIELD
CADRE OR CORE DISASTER RESPONSE, FOR ENGAGING IN ACTIVITIES
PROTECTED BY TITLE VII, THE ADAAA AND 29 C.F.R. §1614.101**

609.   Mr. Reynolds incorporates all above paragraphs by reference.

610.   In or around July 16, 2010, Reynolds applied for the following positions: Attorney-Advisor, GS-0905-13/14, Disaster Response (position one); Attorney-advisor, GS-0905-l3/14, Disaster Response (position two); Attorney-Advisor, GS-0905-13/14, Disaster Response (position three); Attorney Advisor GS-0905-13/14, Disaster Response (position four); Attorney-advisor GS-0905-13/14, Disaster Response (position five);  Attorney-advisor, GS-0905-13/14, FOIA; Attorney-Advisor GS-0905-13/14, Field Attorney Cadre Support; Attorney-Advisor, GS-0905-13/14, ADR Cadre Support.  ROI Tab F-1 at 128-129.

611.   Martinet, Reynolds' former supervisor, was (Agency Alleged Fact No. 66) the selecting official for these numerous Field Cadre and (Agency Alleged Fact 76) CORE Disaster Response positions.

612.   Sevier (Compl. Ex. 2 at 10-11) and Kieserman (Compl. Ex. 72) had to approve Martinet's selections.

613.   Reynolds had emailed Sevier about his EEO case on April 28, 2010.  Compl. Ex. 10 at JR 3033-3034.

614.   Sevier claims he told Martinet back in 2009 that he would not approve selection of Reynolds. Compl. Ex. 69 at 176.

615.    It is undisputed that Reynolds received no interviews from any of these applications.

616.   Reynolds was qualified, as is his name appears on the certificate list.

617.   Martinet sought approval from Sevier and Kieserman for her selectees. Compl. Ex. 72.

618.  However, he was not selected.

619.   Reynolds should have been selected instead of Elizabeth Blair, Jeff Webb or Pat Hogan.

620.   By denying Reynolds selection under any of the July 16, 2010 Field Cadre/Disaster Response applications described, in OCC, on account of his disabilities and EEO and ADAAA-

protected activities, the Defendant unlawfully discriminated and retaliated against Reynolds. (See Count I.)

**COUNT V:     DISCRIMINATORY AND RETALIATORY FAILURE BY FEMA'S OCC, TO RE-HIRE REYNOLDS IN LATE 2011/EARLY 2012, TO A POSITION WITH ITS FIELD CADRE OR CORE DISASTER RESPONSE, FOR ENGAGING IN ACTIVITIES PROTECTED BY TITLE VII, THE ADAAA AND 29 C.F.R. §1614.101**

621.   Mr. Reynolds incorporates all above paragraphs by reference.

622.   As discussed above, Reynolds applied for Assistant Regional Counsel positions and made all the certificate lists, under Agency-generated announcements for General Attorney (Assistant Regional Counsel in Regions 1, 2, 5, 8 and 10), of November 17, 2011. Compl. Ex. 99.

623.   1 year of specialized legal experience was required to apply.

624.   Other announcements were also made that same day. Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing), Alleged Fact No. 46.

625.   It is undisputed that the announcements sought candidates qualified for at least the GS-13 level. Compl. Ex. 15 (Defendant Agency's Supplemental Motion for Partial Dismissal and Motion for a Decision Without a Hearing), Alleged Fact No. 49.

626.   It is undisputed that Reynolds' name appeared on all the resulting certificate lists.

627.   Reynolds possessed nearly a year of FEMA lawyering experience at the time, which was something only one other candidate possessed.

628.   Lisa Katchka, who was subordinate to Kieserman and Sevier, has been identified by the Agency as a recommending or selecting official.

629.   Reynolds was qualified, as is his name appears on the certificate lists.

630.   However, he was not selected, while others—instead of whom Reynolds should have been selected-- including Jennifer Carlisle, Caitlin O'Halloran and Catherine Belfi were.

631.   By denying Reynolds selection under the Announcement described, in OCC, on account of his disabilities and EEO and ADAAA-protected activities, the Defendant unlawfully discriminated and retaliated against Reynolds. (See Count I.)

**COUNT VI: DISCRIMINATORY AND RETALIATORY FAILURE TO RE-HIRE REYNOLDS TO A POSITION WITH OCC IN 2013, UNDER ANNOUNCEMENT MG-2013-9932-MJH-860218COR, FOR ENGAGING IN ACTIVITIES PROTECTED BY TITLE VI, THE ADAAA AND 29 C.F.R. §1614.101**

632.   Mr. Reynolds incorporates all above paragraphs by reference.

633.   Mr. Reynolds applied for the position of CORE Trial Attorney, GS-0905-13, (Job 20) applied under Announcement#: MG-2013-9932-MJH-860218COR, on March 20, 2013, through USAJOBS.

634.   Reynolds was qualified, as is his name appears on the certificate list.

635.   However, he was not selected.

636.   By denying Reynolds selection under the Announcement described, in OCC, on account of his disabilities and EEO and ADAAA-protected activities, the Defendant unlawfully discriminated and retaliated against Reynolds. (See Count I.)

**COUNT VII:  DISCRIMINATORY AND RETALIATORY FAILURE TO RE-HIRE REYNOLDS TO A POSITION WITH OCC IN 2013, UNDER ANNOUNCEMENT MG-2013-9107-MJH-860262COR, FOR ENGAGING IN ACTIVITIES PROTECTED BY TITLE VII, THE ADAAA AND 29 C.F.R. §1614.101**

637.   Mr. Reynolds incorporates all above paragraphs by reference.

638.   Mr. Reynolds applied for a CORE Trial Attorney, GS-0905-13, under Announcement#: MG-2013-9107-MJH-860262COR, on March 20, 2013.

639.   Mr. Reynolds was qualified for the position.

640.   The Agency contends that no individual was selected for the CORE Trial Attorney position (Vacancy Announcement No. MG-20139107-MJH-860262COR), but fails to provide any explanation.

641.   Upon information and belief, the Agency lacks preponderant evidence of a legitimate, non-discriminatory reason for the non-selection, which appears to conform to Sevier's and Kieserman's unlawful determination against rehiring Reynolds.

642.   There is no non-discriminatory reason why the Agency decided it would rather not fill the position than select Mr. Reynolds.   (See Count I.)

67

643.   By denying Reynolds selection under the Announcement described, in OCC, on account of his disabilities and EEO and ADAAA-protected activities, the Defendant unlawfully discriminated and retaliated against Reynolds. (See Count I.)

## COUNT VIII: DISCRIMINATORY AND RETALIATORY FAILURE TO RE-HIRE REYNOLDS TO A POSITION AS AN EEO SPECIALIST, FOR ENGAGING IN ACTIVITIES PROTECTED BY TITLE VII AND THE ADAAA AND 29 C.F.R. §1614.101

644.   Mr. Reynolds incorporates all above paragraphs by reference.

645.   As noted above, Mr. Reynolds applied for an Equal Employment Opportunity Specialist position, under Announcement#: MG-2012-T0265-EAM-656989-D, applied through USAJOBS, on or about May 4, 2012.

646.   The Agency asserts that it made no selection for the position.

647.   Upon information and belief, the selecting official for EEO Specialist work would have been Pauline Campbell as head of the Equal Rights Office.

648.   As noted, Ms. Campbell is familiar with Mr. Reynolds' past claims of discrimination.

649.   Upon information and belief, the Agency lacks preponderant evidence of a legitimate, non-discriminatory reason for the non-selection, which appears to conform to Sevier's and Kieserman's unlawful determination against rehiring Reynolds.

650.   By denying Reynolds selection under the Announcement described on account of his disabilities and EEO and ADAAA-protected activities, the Defendant unlawfully discriminated and retaliated against Reynolds. (See Count I.)

## X.   REQUEST FOR RELIEF

**WHEREFORE, the Plaintiff, Jeff Reynolds, prays that the Court grant him the following relief:**

(a)      Reinstatement to a position at the GS-14 level, with full back pay and benefits.

(b)      Compensatory damages, in an amount to be determined by the jury in accordance with the proof at trial, for the emotional and consequential harm caused by Defendant;

(c)      Prejudgment and post judgment interest;

(d)      Reasonable attorneys' fees, expenses and costs;

(e)      Restoration of all leave used in connection to the case;

(f)      Reimbursement for all expenses incurred related to the case;

(g)      Posting of notices on Defendants' premises notifying employees that Defendant has violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation; and

(h)      Such other relief as the court shall deem just and proper.

## XI. JURY TRIAL DEMAND

The Plaintiff demands that this case be tried by a jury.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

/s/
_____
Leizer Z. Goldsmith
Kyle G. Ingram
5335 Wisconsin Avenue NW Suite 440
Washington, D.C. 20015
Telephone: (202) 895-1506
Facsimile:  (202) 318-0798
Email: lgoldsmith@goldsmithfirm.com